# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01898-SCT

*ESTATE OF VENUS JONES, M.D., LANCE WRIGHT, M.D. AND SEMMES-MURPHY CLINIC, MEMPHIS PATHOLOGY LABS AND BAPTIST RAPID ACCESS LAB*

*v.*

*TYSON PHILLIPS, A MINOR, BY AND THROUGH HIS NEXT FRIEND, MARY JEAN PHILLIPS AND MARY JEAN PHILLIPS, INDIVIDUALLY AND AS CONSERVATOR FOR WILBERT PHILLIPS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/30/2002 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | DION J. SHANLEY |
| | SHELBY DUKE GOZA |
| ATTORNEYS FOR APPELLEES: | W. ERIC STRACENER |
| | W. ANDREW NEELY |
| | THANDI WADE |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 08/28/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Tyson and Mary Jean Phillips, son and wife of the decedent, filed this survival and wrongful-death action in the Circuit Court of Coahoma County, Mississippi, naming Lance

Wright, M.D., and the Semmes-Murphy Clinic, among others, as defendants for the injury to and eventual death of Wilbert Phillips.[1] The circuit court denied the motion to dismiss for lack of jurisdiction filed by Dr. Wright and Semmes-Murphy. The jury unanimously returned a five-million-dollar verdict in favor of the Phillipses, assigning forty percent liability to both Dr. Wright and the Semmes-Murphy Clinic.[2] After overruling post-trial motions for a new

---

[1] The wrongful death beneficiaries will be collectively referred to as ("the Phillipses"). The matter began as a survival action, as Wilbert Phillips had not yet passed away. The plaintiffs were Mary Jean Phillips individually and o/b/o Wilbert Phillips and Tyson Phillips. The only named defendant was Northwest Regional Medical Center. The suit was filed on June 21, 2001. The first complaint does not allege any damages suffered by Mary Jean and Tyson Phillips or request any relief on their behalf. Two amended complaints were filed prior to any responsive pleading. The "Amended Complaint" requested individual relief for Mary Jean and Tyson Phillips for loss of society. It is the first complaint to name Dr. Wright and Semmes-Murphy as defendants. The titles of the complaints leap from "Amended Complaint" to "Third Amended Complaint." There does not appear to be a "Second Amended Complaint." An answer was filed by Memphis Pathology Lab January 16, 2002. Wilbert Phillips died on March 13. Mary Jean Phillips sought leave to file another amended complaint on March 28. On the same day this motion was filed, she also filed a "Fourth Amended Complaint." This complaint is the first to change the style of the action to "Tyson Phillips, a minor by and through his next friend Mary Jean Phillips and Mary Jean Phillips, Individually and on behalf of the wrongful-death beneficiaries of Wilbert Phillips." Within this complaint appear several allegations that Wilbert Phillips "is in a permanent vegetative state." This complaint alleges medical bills, mental distress, past and future suffering, past and future wage loss, loss of enjoyment of life and loss of society as damages. After the circuit court entered an order granting Mary Phillips leave to amend the complaint, she filed a "Fifth Amended Complaint" individually and on behalf of the wrongful-death beneficiaries of Wilbert Phillips. This final complaint alleges medical bills, mental distress, pain and suffering, past and future wage loss and loss of enjoyment of life of Wilbert Phillips; and mental distress and loss of society of Mary Jean and Tyson Phillips as damages. It requested relief for all plaintiffs.
 There are three other wrongful death beneficiaries of Wilbert Phillips: Cardiss Phillips, Wilbert Phillips, Jr. and Lakenna Phillips.

[2] Memphis Pathology Lab and the Estate of Venus Jones M.D., who settled prior to trial, served as empty-chair defendants and were assigned forty percent and twenty percent

2

trial, remittitur, or judgment as a matter of law in favor of Dr. Wright and the clinic, the trial court entered a judgment on the jury's verdict. Dr. Wright and Semmes-Murphy now timely appeal. Miss. R. App. P. 4.

**FACTS**

¶2. Wilbert Phillips, ("Mr. Phillips") a forty-one-year-old father of four, began suffering from headaches around Christmas of 1999. On March 17 of the following year, he was taken to the emergency room of the Northwest Regional Medical Center in Clarksdale, Mississippi, after fainting at his workplace at Parchman prison. When admitted to the hospital, he complained of a severe headache, a stomach ache, tingling in his hands, and feeling faint. He had a fever, decreased attentiveness, decreased range of motion in his cervical spine, nystagmus, and an elevated level of sodium. The admitting physician, Dr. P. W. Hill, requested a consultation from neurologist Dr. Venus Jones. Dr. Jones ordered a computer-aided tomography scan (CAT scan) and a magnetic resonance imagery scan (MRI) of Mr. Phillips's head to assist her in her diagnosis of Mr. Phillips's condition. She did not perform a lumbar puncture. According to Dr. Jones, Mr. Phillips's scans showed no sign of a tumor or other growth. Mr. Phillips was discharged from Northwest Regional Hospital two days later with instructions to report any further dizziness or falls. Mary Phillips, Mr. Phillips's wife, testified at trial that they attempted to schedule a followup appointment several times in the days following discharge but were unsuccessful. Mr. Phillips next saw an

_____

of the liability, respectively, by the jury. The Baptist Rapid Access Lab and these defendants are not parties to this appeal.

3

ophthalmologist, Dr. Scott Cooper, less than one week after discharge from Northwest Regional Medical Center in Clarksdale.

¶3. Mr. Phillips presented to Dr. Cooper with fever, nausea, and an excruciating headache. After examining Mr. Phillips, Dr. Cooper diagnosed Mr. Phillips with bilateral papilledema (swelling of the optic nerves in both eyes due to increased spinal fluid pressure). He placed a telephone call to Dr. Lance Wright, a neurologist with the Semmes-Murphy Clinic in Germantown, Tennessee. Dr. Cooper arranged a work-in consultation appointment for Mr. Phillips with Dr. Wright the next day.

¶4. Dr. Wright saw Mr. Phillips late in the afternoon of Friday, March 24, 2000. Mr. Phillips complained that day of an unbearable headache, loss of sight in his left eye, and double vision.[3] He also indicated he had started having headaches a few months prior to the appointment. Dr. Wright testified Mr. Phillips did not have a fever and was awake and alert when he examined Mr. Phillips. Dr. Wright did not take Mr. Phillips's temperature with a thermometer during his visit; Dr. Wright testified that he used his hand to determine Mr. Phillips's temperature. After taking a patient history and conducting a neurologic examination, Dr. Wright performed a lumbar puncture of Mr. Phillips's spine to relieve the intracranial pressure caused by excessive cerebrospinal fluid. The opening pressure exceeded the maximum reading on the manometer, and cerebrospinal fluid started bubbling

_____

[3]According to Mary Phillips's testimony at trial, Mr. Phillips fainted again just prior to the appointment. There is nothing in Mary Phillips's testimony to indicate Dr. Wright was informed of this fall during this office visit.

over the top of the gauge. Dr. Wright took samples of the fluid and sent them to the Memphis Pathology Lab in Memphis for general testing on the spinal fluid. He also drained the excess fluid, reducing the pressure to within the normal range. Based on the limited history given to him by Mr. Phillips and the results of his own examination, Dr. Wright diagnosed Mr. Phillips with pseudotumor cerebri: a condition that occurs from elevated spinal fluid pressure, causing severe headaches and vision problems. He sent Mr. Phillips home after the office visit with a prescription for Diamox (acetazolamide) to reduce the production of spinal fluid.

¶5. At trial, the date when Memphis Pathology Lab returned the results of the tests on Mr. Phillips's cerebrospinal fluid was a contested issue of fact. Evidence was submitted that the Memphis Pathology Lab faxed the test results to Dr. Wright's office at 7:07 p.m. the same day that Dr. Wright requested the results. Dr. Wright testified he did not receive the results of the test until four days later. The results showed a substantially elevated level of white blood cells in Mr. Phillips's cerebrospinal fluid and the presence of cryptoccocal meningitis: a fungal infection that causes increased intracranial pressure and damage to the brain tissue. That Tuesday, the same day Dr. Wright testified he became aware of the infection, Dr. Wright called Mary Phillips and instructed her to take Mr. Phillips to Baptist Hospital-East in Germantown, Tennessee. Dr. Wright also called Dr. Cooper to inform him of the development.

¶6. At the hospital, Dr. Wright immediately began a course of antibiotic treatments for the meningitis. This treatment eventually eliminated the infection. However, within a week

5

of admission, Mr. Phillips became lethargic and immobile. He lost the ability to communicate verbally. Mr. Phillips suffered from seizures and fell into a coma. He was transferred to a restorative care unit in a vegetative state. After a month and a half of restorative care, Mr. Phillips was discharged to his family in a persistent vegetative state.

¶7. Mary and Tyson Phillips, with the assistance of home-health agencies, provided care and comfort for Mr. Phillips; bathing, exercising, cleaning, feeding, and repositioning him and maintaining his equipment. They sought another opinion concerning Mr. Phillips's prognosis from doctors at the University of Michigan and were told Mr. Phillips could be admitted to a special home where he could receive better health care. The Phillipses decided to continue caring for Mr. Phillips at home. Mr. Phillips died of pneumonia, a complication of the cryptoccocal meningitis infection, almost two years after seeing Dr. Wright.

¶8. At the time the suit was first filed, Dr. Wright was a resident of Tennessee. The Semmes-Murphy Clinic was a foreign corporation whose principal place of business was Memphis, Tennessee. Both were engaged in the business of providing medical advice and treatment to patients at various Semmes-Murphy clinics and at hospitals in and surrounding Memphis. Both were served with process via certified mail. Miss. R. Civ. P. 4(c)(5).

## ISSUES

I. **WHETHER THE TRIAL COURT LACKED PERSONAL JURISDICTION OVER DR. WRIGHT AND SEMMES-MURPHY.**

II. **WHETHER THE TRIAL COURT ERRED IN OVERRULING DR. WRIGHT'S AND SEMMES-MURPHY'S *BATSON* CHALLENGES.**

6

III.     WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT.

IV.     WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR A NEW TRIAL.

V.      WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR REMITTITUR.

## DISCUSSION

I.      WHETHER THE TRIAL COURT LACKED PERSONAL JURISDICTION OVER DR. WRIGHT AND SEMMES-MURPHY.

¶9.     This Court conducts a de novo review of jurisdictional matters. *McDaniel v. Ritter*, 556 So. 2d 303, 308 (Miss. 1989) (*citing **MISS CAL 204, Ltd. v. Upchurch***, 465 So. 2d 326, 330 (Miss. 1985); ***S & A Realty Co. v. Hilburn***, 249 So. 2d 379, 382 (Miss. 1971)). Jurisdiction is determined as of the time the suit is filed. ***Euclid-Mississippi v. Western Cas. & Sur. Co.***, 249 Miss. 547, 554, 163 So. 2d 676, 679 (1964); ***Compton v. Compton***, 188 Miss. 670, 673, 196 So. 2d 635, 637 (1940). The proper order when analyzing personal jurisdiction over nonresident defendants is to first consider whether the long-arm statute subjects a nonresident defendant to personal jurisdiction and then to consider whether the statute's application to that defendant offends the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. ***Sorrells v. R & R Custom Coach Works, Inc.***, 636 So. 2d 668, 671 (Miss. 1994). *See also **Horne v. Mobile Area Water & Sewer Sys.***, 897 So. 2d 972, 976 (Miss. 2004).

7

¶10. Dr. Wright and Semmes-Murphy filed a motion to dismiss based upon the circuit court's lack of jurisdiction over their person after the Phillipses filed their Third Amended Complaint. They were deposed concerning their jurisdictional contacts. The Phillipses also propounded requests for admission upon the doctor and clinic. After further briefing and a hearing, the circuit court denied the motions to dismiss. Dr. Wright and Semmes-Murphy again raised the matter of jurisdiction in post-trial motions. The circuit court denied those motions as well.

## A. Long-arm statute

¶11. On appeal, Dr. Wright and the clinic first argue Mississippi's long-arm statute does not reach to subject them to suit in Mississippi courts. The Phillipses respond that either or both of the "tort" or "doing business" components of the long-arm statute enabled the circuit court to exercise personal jurisdiction over Dr. Wright and the clinic. Section 13-3-57 of the Mississippi Code, commonly called the long-arm statute, provides, in relevant part:

> Any nonresident person . . . or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall . . . commit a tort in whole or in part in this state against a resident or nonresident of this state, *or who shall do any business or perform any character of work or service in this state*, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

Miss. Code Ann. § 13-3-57 (Rev. 2002) (*emphasis added*.) "The threshold condition for application of the long-arm statute is the requirement that the nonresident corporation, over which personal jurisdiction is sought, is not a corporation qualified to do business in this state." **Sorrells**, 636 So. 2d at 671.

8

¶12.    Assuming, for argument's sake, that Semmes-Murphy was a foreign corporation **not** qualified to do business in Mississippi[4], the clinic and Dr. Wright still subjected themselves to the personal jurisdiction of Mississippi courts under the "doing-business" component of Mississippi's long-arm statute, as discussed below.

## 1.    Nonresident jurisdiction pursuant to "doing-business" component

¶13.    The clinic and Dr. Wright argue the clinic's contacts with this state cannot be imputed to Dr. Wright for long-arm statute analysis purposes because the clinic's liability was derivative of Dr. Wright's conduct.  They also argue the character of work Dr. Wright performed in this state was not related to any act or transaction "from which this action arose."  The Phillipses argue there is nothing within the long-arm statute which restricts its application to the cause of action.

¶14.    The long-arm statute could not be more clear: Any corporation or person "who shall do any business or perform any character of work or service in this state" is subject to the personal jurisdiction of Mississippi courts.  Miss. Code Ann. § 13-3-57 (Rev. 2002).  At one

---

[4]Semmes-Murphy was a corporation qualified to do business in this state in June 2001.  *See Sorrells*, 636 So. 2d at 671.  By registering with the Secretary of State, Semmes-Murphy was granted "the same powers as an individual to do all things necessary or convenient to carry out its business and affairs, including . . . [t]o sue and be sued, complain and defend in its corporate name;" and subjected itself to the same due process procedure for suits against resident corporations.  Miss. Code Ann. §§ 13-3-49 (Rev. 2002); Miss. Code Ann. §§ 77-4-3.02, 77-4-5.04, 77-4-15.05, 77-4-15.10 (Rev. 2000); Miss. R. Civ. P. 4(d)(4).  Semmes-Murphy Clinic, Inc. is now listed as an inactive corporation with the Mississippi Secretary of State's Office.  The first annual report was filed in 1989.  The last annual report was filed on November 19, 2003.  Tim Roberts, the Rule 30(b)(6) designee for Semmes-Murphy's jurisdictional deposition, was listed as the registered agent for process by the corporation.  Miss. R. Civ. P. 30(b)(6).

9

point, the long-arm statute required the cause of action to be connected with the business or work or service in this state.[5] *See Mladinich v. Kohn*, 250 Miss. 138, 147, 164 So. 2d 785, 790 (1964). The Legislature removed this "nexus" requirement in 1991. *Gross v. Chevrolet Country, Inc.*, 655 So. 2d 873, 878 (Miss. 1995). As it stands now, the long-arm statute, by its plain terms, applies to any person or corporation performing any character of work in this state.

¶15. It is uncontested that Dr. Wright was licensed to practice medicine in Mississippi in 2001 and did so "occasionally" (or "hardly ever"), visiting the patients of another Semmes-Murphy physician who were being treated at Baptist Hospital-DeSoto in Southaven, Mississippi.[6] The clinic had an office in Southaven and rented "timeshare" office space in Grenada and Corinth, Mississippi.[7] It staffed these offices with physicians who treated patients who resided in Mississippi. The evidence indicates both Dr. Wright and the clinic did business or performed work in this state. We find that Dr. Wright and the Semmes-

---

[5]It stated that process against a nonresident defendant could be served upon the Secretary of State for "any action, accrued or accruing **from the doing of such business or the performing of such work or service**, or as an incident thereto by any such non-resident, or his, their or its agent, servant or employee." *Mladinich*, 250 Miss. at 144 (quoting the former statute, emphasis added.)

[6]Dr. Wright referred to this as "covering" the other doctor's patients, which included "rounding" on them. This activity ceased in early 2001.

[7]According to Tim Roberts, "We have what are considered timeshare offices. I don't consider that an office. It's–but it's a place we rent for a half a day or week and things like that."

10

Murphy Clinic did business in this state and, therefore, are subject to the jurisdiction of Mississippi courts under the clear terms of the long-arm statute.

¶16.   Since both Dr. Wright and the Semmes-Murphy Clinic subjected themselves to suit under the "doing-business" component of the long-arm statute, considering whether the tort component of the long-arm statute also subjects both to the jurisdiction of Mississippi courts is unnecessary.

¶17.   The next issue is whether the circuit court's assertion of jurisdiction over Dr. Wright and the Semmes-Murphy Clinic under the long-arm statute offends the Due Process Clause of the Fourteenth Amendment.

### B.      Due Process

¶18.   "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 2d 95  (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 2d 278 (1940).)  "The requirements of *International Shoe* . . . must be met as to each defendant over whom a state court exercises jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 332, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980).  *Cf. Calder v. Jones*, 465 U.S. 783, 790, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984) (an employee's contacts with the forum state are not to be judged according to the employer's activities there).  Since the opinion in *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed.

11

2d 92 (1987), courts have divided the question whether due process has been afforded a nonresident defendant into two considerations: (1) the extent and quality of the contacts of the defendant with the forum state and, assuming sufficient minimum contacts exist, (2) whether the maintenance of the suit in the forum state offends traditional notions of fair play and substantial justice. *See Id.*, 480 U.S. at 113-15; ***Amer. Cable Corp. v. Trilogy Communications, Inc.***, 754 So. 2d 545, 550-552 (Miss. Ct. App. 2000); ***Allred v. Moore & Peterson***, 117 F.3d 278, 285 (5th Cir. 1997). In keeping with this practice, we will similarly divide the issue.

### 1. Minimum contacts

¶19. Dr. Wright argues he did not have sufficient minimum contacts with the State of Mississippi to reasonably anticipate being haled into court here. He and Semmes-Murphy again argue that the clinic's contacts with this state cannot be imputed to him because the clinic's liability was derivative of his own.[8] The Phillipses respond by arguing both the clinic and Dr. Wright have minimum contacts generally with Mississippi; the clinic's contacts can be imputed to Dr. Wright; and Dr. Wright's specific contacts with the sate as part of his treatment of Mr. Phillips all subjected them to the jurisdiction of the circuit court below.[9] We agree that the clinic's contacts with this state cannot be imputed to Dr. Wright

---

[8]They concede "jurisdiction is proper under the 'doing business' prong of the long-arm" statute if the clinic's contacts with Mississippi can be imputed to Dr. Wright.

[9]The Phillipses argue elsewhere that they developed an independent case against Semmes-Murphy, making the clinic's liability direct, not derivative. However, according to the several complaints filed by the Phillipses, specific portions of the pretrial order and

12

for purposes of determining whether Dr. Wright has minimum contacts with Mississippi. *See Rush*, 444 U.S. at 332; *Calder*, 465 U.S. at 790. However, Dr. Wright's own contacts with this state subjected him to the jurisdiction of our state courts so that the Due Process Clause was not offended.

¶20.    Historically, minimum contacts have been split into two types: those which invoke specific jurisdiction over a defendant and those that lead to general jurisdiction over a defendant. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-415, nn.8, 9, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, n.15, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). *See also Am. Cable Corp.*, 754 So. 2d at 550; *Allred*, 117 F.3d at 286. The U.S. Supreme Court explained the requirements for specific jurisdiction as follows:

> Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this "fair warning"[that a particular activity may subject the defendant to the jurisdiction of a foreign sovereign] requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

*Burger King Corp.*, 471 U.S. at 472. We may exercise general jurisdiction over a nonresident defendant when the cause of action does not arise out of or relate to the defendant's activities in the forum state as long as  the defendant's contacts with the forum

---

the evidence at trial, Semmes-Murphy's liability was always intended to be derivative under a theory of vicarious liability.

are systematic and continuous. *Helicopteros*, 466 U.S. at 415-418. This lawsuit is related to Dr. Wright's contacts with Mississippi so that the circuit court properly exercised specific jurisdiction over him.

### a. Specific jurisdiction

¶21. The record reflects that Dr. Wright was first licensed to practice medicine in this state in 1993 and practiced here until early 2001. The nature of his practice within this state was covering the patients of another physician associated with Semmes-Murphy at Baptist Hospital-Southaven, Mississippi. When he moved to Memphis in 1993 to practice with Semmes-Murphy, Dr. Wright knew this coverage was expected of him, so he maintained a medical license from Mississippi.[10] He described the frequency of his coverage of that doctor's patients as "occasionally" or "hardly ever." He also made telephone calls to this state to Mary Phillips and Dr. Cooper for the purpose of having Mr. Phillips travel to Memphis for immediate medical treatment. Ordinarily, this phone call would be an incidental contact with this state caused by the necessity to have Mr. Phillips obtain further medical treatment immediately. However, Dr. Wright specifically instructed Mr. Phillips to come to the Baptist Hospital in Memphis (where Dr. Wright apparently had admitting privileges) rather than generally instructing Mr. Phillips to go to a hospital (such as Northwest Regional in Clarksdale) and seeking to have him admitted there. This distinction

---

[10] A license to practice medicine in the State of Mississippi must be renewed every year. Miss. Code Ann. § 73-25-14(1) (Rev. 2004).

illustrates how this contact was directed toward a resident of Mississippi and drawing that resident to another forum rather than the resident independently choosing to exit the state.

¶22.    Dr. Wright's activities were directed purposefully at residents of this state, and from these activities the present litigation arose.  Dr. Wright reasonably could have anticipated being sued for negligent treatment in Mississippi courts.  Therefore, Dr. Wright had minimum contacts with this state such that the circuit court's exercise of specific jurisdiction over him was not constitutionally deficient.

### 2.    Fair play and substantial justice

¶23.    "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"  **Burger King Corp.**, 471 U.S. at 476 (*quoting* **Milliken**, 311 U.S. at 463).  The U.S. Supreme Court has outlined the factors to be considered in determining whether the assertion of personal jurisdiction will comport with fair play and substantial justice:

> We have previously explained that the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors.  A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.  It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal Indus. Co.*, 480 U.S. at 113 (*quoting* **World-Wide Volkswagen**, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).)  The briefing of this issue by Dr. Wright

15

mainly consists of arguments that the trial court simply should not have assumed jurisdiction. The Phillipses argue the factors listed above support a finding that the circuit court's exercise of jurisdiction over Dr. Wright was fair and reasonable. This Court agrees with the Phillipses.

¶24. The only fact in the record addressing the burdens imposed on Dr. Wright by being tried in Coahoma County, Mississippi, is a question asked by counsel for the Phillipses in Dr. Wright's jurisdictional deposition:

> [Q.] Other than the time and the travel and that sort of thing, can you tell me of any particular burdens that it would be – that you would have defending this lawsuit in the state of Mississippi?
>
> A. No.

Considering the interests of this state in providing a forum for legal redress for residents who are negligently injured by out-of-state physicians and the Phillipses' particular interest in obtaining relief in this case, we find that the circuit court's assumption of personal jurisdiction over Dr. Wright comported with traditional notions of fair play and substantial justice. Nothing in the record suggests this trial was an inefficient method of resolving this dispute or that it imposed an undue burden to have Dr. Wright defend the suit in Mississippi.

¶25. Therefore, the long-arm statute, under its "doing-business" component, subjected Dr. Wright and Semmes-Murphy to the jurisdiction of the circuit court, and its application does not offend the Fourteenth Amendment to the United States Constitution. There is no merit to the arguments on the first assignment of error.

16

## II. WHETHER THE TRIAL COURT ERRED IN OVERRULING DR. WRIGHT'S AND SEMMES-MURPHY'S *BATSON* CHALLENGES.

¶26.   Dr. Wright and Semmes-Murphy next argue the Phillipses violated the Due Process Clause of the Fourteenth Amendment by discriminatorily using three of their four peremptory challenges against white members of the venire.[11]  The Phillipses respond that the doctor and clinic failed to make a prima facie showing of purposeful discrimination and further failed to demonstrate that the race-neutral reasons offered by the Phillipses were pretexts for purposeful discrimination.  We find the Phillipses are ultimately correct.

¶27.   Dr. Wright and the clinic argued a prima facie showing of purposeful discrimination to which the  Phillipses  volunteered their race-neutral reasons for peremptorily striking the three jurors.[12] The trial court then stated its ruling:

> All right.  The Court finds the reasons given were race neutral.  And it was a close call as to whether a systematic pattern had been established, but even if that were the case, race neutral reasons have been given.[13]

---

[11]*See **Batson v. Kentucky**, 476 U.S. 79, 97-98, 106 S. Ct. 1712, 1724, 90 L. Ed. 2d 69, 88, (1986); **Edmonson v. Leesville Concrete Co**., 500 U.S. 614, 628-29, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

[12]The trial court overruled the premature **Batson** challenges made by Dr. Wright and the clinic.  These constitutional challenges were made prior to when the plaintiff tendered an entire panel of petit jurors to the defendants.  *See* U.R.C.C.C. 4.05.  This being a civil case, each side had four peremptory strikes.  Miss. R. Civ. P. 47(c).  The Phillipses' peremptory strikes were used against jurors Cauthen (#4), a white male; Marbley (#12), a black female; "Vincent" (#16), a white female; and Clark (#24), a white female.

[13]This is the entirety of the judge's ruling on the **Batson** challenge.  Neither party argues on appeal that the trial judge erred in failing to make an on-the-record finding of fact as to each peremptory challenge.

17

The trial judge did not directly rule on whether Dr. Wright and the Semmes-Murphy Clinic made a prima facie showing of purposeful discrimination, yet clearly ruled on the ultimate issue of the race-neutral reasons after they were offered. This Court historically has followed the rule that once a party "has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Pruitt v. State*, 2008 Miss. LEXIS 346, *7 (Miss. July 23, 2008) (*quoting Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L. Ed. 2d 395 (1991)). However, to clarify any dispute, we will briefly discuss the issue on its merits.

¶28.    Dr. Wright and the Semmes-Murphy Clinic argued that the percentage of strikes against a racial group of which Dr. Wright was a member was prima facie evidence of discrimination. "[T]hough the sheer number of strikes exercised against a cognizable group of jurors is not itself dispositive of our analysis, 'the relative strength of the prima facie case of purposeful discrimination will often influence this inquiry' into *Batson* challenges." *Flowers v. State*, 947 So. 2d 910, 935 (Miss. 2007) (*quoting Sewell v. State*, 721 So. 2d 129, 136 (Miss. 1998)). A showing that the Phillipses used three out of four strikes or seventy-five percent of their strikes against members of the white race will strengthen a prima facie case for discrimination, but the complaining party must go further. "[A] prima facie case requires . . . [the complaining party] to produce sufficient evidence to permit the trial judge to infer purposeful discrimination." *Strickland v. State*, 2008 Miss. LEXIS 132, *23 (Miss. March 6, 2008); *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, n.7, 101 S.

18

Ct. 1089, 1094, 67 L. Ed. 2d 207, 216 (1981) ("[t]he phrase 'prima facie case' . . . may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue.")  Unfortunately, the record does not support further evidence that would prove that the strike percentages alone satisfy a prima facie case of discrimination.  The trial record does not reflect the racial makeup of the venire, the empaneled jury, the community at large or any other factor that might suggest these percentages alone suggest discrimination.[14]  However, as the trial judge made a ruling on the Phillipses' race neutral reasons for the strikes, the Phillipses' argument that Dr. Wright failed to prove his prima facie case is moot.

¶29.    Once a prima facie showing of purposeful discrimination has been made, the proponent of the strike must offer race-neutral reasons for the strike, and the opponent must be given an opportunity to rebut the reasons offered by the proponent.  Then, the trial court must make findings of fact regarding those reasons on the record and rule whether the opponent of the strike has proven purposeful discrimination.  *Batson*, 476 U.S. at 97-98; *Brawner v. State*, 872 So. 2d 1, 9-10 (Miss. 2004); *Johnson v. State*, 754 So. 2d 1178, 1180 (Miss. 2000); *Hatten v. State*, 628 So. 2d 294, 298 (Miss. 1993). *See also Burnett v. Fulton*, 854 So. 2d 1010, 1013-14 (Miss. 2003).  The reasons for the strikes can be shown to be pretextual where there exists:

---

[14]The record must give weight to support the claim. *Strickland*, 2008 Miss. LEXIS 132, *23 (no record to support discrimination even though seven strikes used against African-Americans); *compare Chisolm v. State*, 529 So. 2d 630 (Miss. 1988) (twelve peremptory challenges, seven of which were used to exclude black persons from the jury.)

(1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Manning v. State*, 765 So. 2d 516, 519 (Miss. 2000) (citations and quotations removed.)[15]

On appeal, this Court reviews the decision of the trial court with great deference and will not overturn the trial court's ruling unless it is clearly erroneous or against the overwhelming weight of the evidence. *Batson*, 476 U.S. at 98; *Chisolm v. State*, 529 So. 2d 630, 633 (Miss. 1988); *Lockett v. State*, 517 So. 2d 1346, 1352 (Miss. 1987).

¶30.    Dr. Wright and the clinic particularly argue the reasons offered by the Phillipses for striking certain jurors were pretextual because they resulted in (1) disparate treatment of one white member of the venire, (2) the failure to voir dire a black juror regarding his connection to the medical industry, (3) the lack of a record supporting a reason offered by the Phillipses

---

[15]The list upon which this is based comes from *Whitsey v. State*, 796 S.W.2d 707, 713-714 (Tex. Crim. App. 1989) and it is reproduced here:
1. The reason given for the peremptory challenge is not related to the facts of the case [#3 above];
2. there was a lack of questioning to the challenged juror or a lack of meaningful questions [#4 above];
3. Disparate treatment – persons with the same or similar characteristics as the challenged juror were not struck [#1 above];
4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members [#2 above]; and
5. an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically [#5 above].

to strike a white member of the venire and (4) discrimination on the basis of a group-based trait. The Phillipses address each peremptory strike in their brief.

¶31. The record of the characteristics of the members of the venire who were peremptorily stricken and of comparative jurors who sat on the jury was developed through the arguments of counsel.[16] The voir dire was apparently done in stages. The first stage was general voir dire wherein the court and the attorneys asked questions of the entire venire in open court. The second stage was done in chambers, in which the attorneys briefly asked questions of particular members of the venire and were given an opportunity to seek their removal for cause or to rehabilitate them.[17] The entirety of the first stage is left out of the record "as per request."

---

[16]This includes the race of the stricken jurors. While the parties do not contest the fact that the Phillipses used three of their four peremptory strikes to exclude white members of the venire from the jury, we have only the attorneys' assertions of their race as support. The circuit court made no particular findings with respect to the stricken jurors' races. Similarly, the record does not reflect the racial makeup of the jury or the venire at all. There is only the uncontested allegation in the appellant's brief that the jury consisted of eleven African-American jurors and one white juror and that the venire reflected the general racial makeup of Coahoma County. It is noted that jury voir dire and "any list from which grand or jurors are selected" are excluded from the record unless they are specifically designated. Miss. R. App. P. 10(b)(3)(iv), (vi).

[17]This was done for jurors Cauthen (#4), Williams (#7), Bradley (#22), Cachafiero (#23), McBrayer (#27), Dixon (#30), Green (#36) and one only identified as number 54. Though the Phillipses discuss Cauthen in their brief, Dr. Wright does not take issue with the Phillipses' use of their first peremptory strike on him except that his strike helped demonstrate a pattern of striking white jurors. Williams, Cachafiero, and McBrayer were stricken by the trial court for cause. Bradley and Dixon served on the jury, and Green served as the first alternate.

21

¶32. Dr. Wright argues Juror 16, whom the Phillipses peremptorily struck with their third strike, was treated differently from Juror 9, who served as the fourth juror. Counsel represented to the Court that both were involved in the medical field, yet Juror 9, a black male, was not stricken, and Juror 16, a white female, was peremptorily stricken. The trial judge made a finding that Juror 9 "did not have other factors to be considered along with the fact that he is an ambulance driver." The Phillipses offered a second and third reason to strike Juror 16 peremptorily: the Juror knew Gloria Mitchell, a potential witness, and she said she felt there were too many lawsuits, especially against physicians. This Court finds that these are sufficient race-neutral reasons that precluded a finding of disparate impact.

¶33. Dr. Wright further argues the Phillipses failed to voir dire Juror 16 on why her indirect connections to the medical profession would result in bias against the Phillipses. Assuming the recorded arguments of counsel are true, Juror 16 expressed the opinion that there are too many lawsuits, especially against physicians. Considering this assertion, it seems unnecessary for the Phillipses to further question Juror 16 concerning the potential for any bias against the Phillipses.

¶34. Dr. Wright also argues the Phillipses failed to voir dire Jurors 16 and 24 concerning their relationships with a potential witness. Like Juror 16, there is no record of the voir dire of Juror 24, thus this Court cannot ascertain whether this argument is valid.

¶35. Finally, Dr. Wright argues the three white members of the venire peremptorily struck by the Phillipses were stricken because of a "group-based trait," namely their race. The

record itself refutes this premise, assuming the jury's makeup alleged in Dr. Wright's brief is accurate, because a white juror joined the unanimous verdict against Dr. Wright.

¶36. Based on the available record, we cannot say the trial judge clearly erred in finding the Phillipses' reasons for striking jurors were race-neutral.

## III. WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT.

¶37. Dr. Wright next argues that there was insufficient evidence at trial to show that Dr. Wright owed Mr. Phillips a duty to follow up with the Memphis Pathology Lab on the test results run on his cerebrospinal fluid within four days after drawing the sample. He also argues there was insufficient evidence that his failure to do so proximately caused Mr. Phillips's death. Dr. Wright preserved this argument for appeal by moving the trial court for a directed verdict in his favor at the close of the plaintiff's case-in-chief and for judgment notwithstanding the jury's verdict. Miss. R. Civ. P. 50(a), (b).

¶38. This Court's standard of review on motions for directed verdict and judgment notwithstanding the verdict are the same. *Spotlite Skating Rink, Inc. v. Barnes*, 2008 Miss. LEXIS 322, *6 (June 19, 2008) (citing *Ala. Great S. R.R. Co. v. Lee*, 826 So. 2d 1232, 1235 (Miss. 2002)). We will "'consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence.'" *Spotlite Skating Rink, Inc.*, 2008 Miss. LEXIS 322 at *6 (quoting *Lee*, 826 So. 2d at 1235). If the evidence is sufficient to support a verdict for the non-moving party, then denial of the motion was proper. *Spotlite Skating Rink, Inc.*, 2008 Miss. LEXIS 322

at \*6 (quoting **Henson v. Roberts**, 679 So. 2d 1041, 1044-1045 (Miss. 1996)). Thus, this Court considers "'whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.'" **Spotlite Skating Rink, Inc.**, 2008 Miss. LEXIS 322 at \*6 (quoting **White v. Stewman**, 932 So. 2d 27, 32 (Miss. 2006)). We find that there is sufficient evidence of duty and proximate cause to affirm the jury's verdict.

**A. Duty**

¶39. Dr. Wright argues the testimony of the Phillipses' expert witness, Dr. Victor Barredo,[18] placed upon him a conditional duty of care: If Dr. Wright did not diagnose Mr. Phillips with a potentially life-threatening infection, then he was under no duty to follow up with the lab. The Phillipses respond by arguing this case was a classic "battle of the experts" and that Dr. Barredo's testimony articulated a duty of care placed upon Dr. Wright, which he breached. Although Dr. Barredo's testimony is, in specific places, unclear concerning when a minimally competent physician under similar circumstances should have followed up with the lab, we find that Dr. Barredo's testimony sufficiently articulated such a duty of care, which Dr. Wright breached.

¶40. Dr. Barredo did testify conditionally with respect to a physician's duty to follow up with a pathology lab running tests on samples of cerebrospinal fluid drawn from the physician's patient:

---

[18] Dr. Victor Bareredo was a neurology consultant practicing in Florida.

> The whole question is, when are [physicians] responsible for knowing [results of lab tests]? If it is a **non-acute case** or something that is not very serious, it may be something that you can **wait until the laboratory calls you back**. If it is something that is **potentially life threatening**, then you need to know it within whatever appropriate period it is. That period can vary from a sugar you send off in somebody who you think is hypoglycemic, where you need to know the results in 20 or 30 minutes, versus a scan that you do on somebody that has had a stroke where you have three hours to do something about the stroke before it's too late. So all the tests have certain time limits.
>
> . . . .
>
> If the [physician] feels that there's a possibility of an infection, **an infection in the nervous system is a life threatening emergency**. You may give it eight hours. You may give it twelve hours. But certainly within a certain amount of time if there's some abnormality you need to know.

The question of whether Dr. Wright in fact met the condition that he felt that Mr. Phillips was suffering from a life-threatening infection was contested at trial. Dr. Barredo stated that the fact that Dr. Wright sent the cerebrospinal fluid off for testing (and conditioned further testing on whether the first results indicated an elevated level of white blood cells in the cerebrospinal fluid) was circumstantial evidence that Dr. Wright suspected Mr. Phillips had meningitis. Dr. Barredo indicated that when treating pseudotumor cerebri, a physician might not even send off the spinal fluid for testing.[19] Dr. Wright testified that he did not suspect Mr. Phillips suffered from meningitis, as indicated by his diagnosis and that he sent the spinal fluid for testing only as a matter of routine. Dr. Wright's testimony that he did not suspect meningitis was impeached, but only to the extent that he initially considered the possibility that Mr. Phillips suffered from meningitis at the beginning of the office visit, but could not

---

[19] It was uncontested at trial that pseudotumor cerebri is not a life-threatening condition.

rule it out as a possible diagnosis after taking Mr. Phillips's patient history, performing the neurologic examination and performing the lumbar puncture. Dr. Barredo's testimony was sufficient to establish the duty of care owed by Dr. Wright to Mr. Phillips, although it was stated conditionally. The jury's verdict supports the conclusion that it found, on conflicting evidence, that Dr. Wright met the condition to have this duty to follow up with the lab imposed upon him. It was uncontested at trial that Dr. Wright did not attempt to follow up with the lab. We find this issue is without merit.

### B. Proximate cause

¶41. Dr. Wright next argues there is insufficient evidence in the record that his failure to follow up with the lab and begin treatment for Mr. Phillips before March 28 proximately caused Mr. Phillips's death. Specifically, he argues that the testimony of Dr. Gary Simon[20] (the Phillipses' infectious disease expert) relied upon the assumption that Mr. Phillips had a change in mental status between March 24 and March 28, 2000. He argues that since the facts presented to the jury at trial do not support that assumption, then Dr. Simon's testimony concerning causation is unsupported and insufficient. The Phillipses respond by arguing the jury had conflicting evidence and was properly charged with deciding the issue; that Dr. Barredo also testified consistently with Dr. Simon that Mr. Phillips would have recovered if treatment began on March 24; and that the record indicates Mr. Phillips's mental state had declined between March 24 and March 28. Dr. Simon's testimony, together with Dr.

---

[20] Dr. Gary Simon was Director of the Department of Infectious Diseases at George Washington University in Washington, D.C.

26

Barredo's testimony, provided sufficient evidence of causation to make the issue a question for the jury.

¶42.    Nowhere did Dr. Simon's testimony state that Mr. Phillips had a change in mental status between March 24 and March 28 or that such a change in mental status would affect his other opinions on causation.  Dr. Wright's submitted briefs provide no helpful citation to the record.

¶43.    The record does provide plenty of testimony from Dr. Simon that Dr. Wright's failure to treat Mr. Phillips before March 28 proximately caused or contributed to Mr. Phillips's lapse into a persistent vegetative state and ultimately to his death.  Dr. Simon testified that the fact that Mr. Phillips did not receive care before March 28 led to Mr. Phillips's subsequent problems.   The persistent vegetative state came about either as a product of the cryptococcus infection invading and damaging the brain tissue or from the elevated intracranial pressure caused by the cryptoccocal meningitis.  Dr. Simon also testified that if treatment had begun on March 25, Mr. Phillips would not have fallen into a persistent vegetative state.  He testified that Mr. Phillips would have received intravenous therapy and would have been discharged from the hospital in approximately two weeks, probably with instructions to take an oral antibiotic for two to four weeks.  He stated that Mr. Phillips "would have been basically normal," however, he "possibly" could have suffered hearing loss.  Dr. Simon had not seen a "patient go blind now in years with cryptoccocal meningitis" and doubted that Mr. Phillips would have had any loss of vision.  He further testified:

> Well, I think at that point he [Phillips] was on the precipice, he was right at the cliff and he tipped over. And that four days, either through the pressure that he developed or through the cryptococous moving a little bit further down the line, he ended up having a, and I think, I believe he had, actually, a thrombosis of the veins in his brain, such that he infarcted and we had, he basically, had multiple strokes.

Dr. Simon testified that only twelve percent of patients who possess three criteria (prognostic factors) at the time they begin treatment die of cryptoccocal meningitis: (1) the patient has a headache; (2) the patient has a normal mental status; and (3) the patient has a white-blood-cell count of greater than twenty.[21] Dr. Simon stated conclusively that had treatment started on March 25, Mr. Phillips would have survived the meningitis infection.

¶44. Dr. Barredo also testified that timely treatment would have probably resulted in the recovery of Mr. Phillips. "I think that there was a better than fifty percent chance that [Mr. Phillips] could have lived if he had been treated on the 24th vs. the 28th." He further testified that Mr. Phillips would have been able to function ("walk, talk, watch TV, read, maybe even work on the job") with minimal deficits such as being forgetful at times. Based upon this testimony concerning causation, there is sufficient evidence in the record demonstrating that Dr. Wright's negligence proximately caused injury to Mr. Phillips and his eventual death. There being sufficient evidence in the record of both duty and proximate cause, we find that there is no merit to this assignment of error.

## IV. WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR A NEW TRIAL.

---

[21]Presumably twenty white blood cells per one micro-liter or cubic millimeter of fluid.

¶45. Dr. Wright next argues the circuit court erred in denying his motion for a new trial. He states the causation testimony discussed above was "speculation" and argues no connection was made between the breach of duty and Mr. Phillips's injury and death. He further argues that the weight of the testimony of the experts indicated it was more likely Mr. Phillips would not have survived or avoided permanent injury because he was not properly treated on March 17, rather than March 24, and that the passage of time between the 24th and 28th did not affect Mr. Phillips's prognosis. He also argues the length of the jury's deliberation indicated it was biased against him. The Phillipses state that Dr. Wright's arguments here simply rehash those made in the previous assignment of error. They assert sufficient proof is in the record to show a causal link between the breach of duty and Mr. Phillips's injury and death. Arguing this case was a classic "battle of the experts," the Phillipses submit the trial court correctly denied Dr. Wright's motion for a new trial.

¶46. This Court's standard for reviewing a trial court's judgment on a motion for a new trial also should be familiar:

> Where an appellant challenges a jury verdict as being against the overwhelming weight of the evidence or the product of bias, prejudice or improper passion, this Court will show great deference to the jury verdict by resolving all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor. *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n*, 560 So. 2d 129, 131 (Miss. 1989). "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Herrington v. Spell*, 692 So. 2d 93, 103-04 (Miss. 1997).

*Venton v. Beckham*, 845 So. 2d 676, 684 (Miss. 2003). *See also White*, 905 So. 2d at 510. In this context, the Court assumes a role as a "thirteenth juror." *Johnson v. St.*

*Dominics–Jackson Mem'l. Hosp.*, 967 So. 2d 20, 23 (Miss. 2007). This Court finds that the Phillipses are correct and this issue is without merit.

¶47. The Phillipses assert that Dr. Wright's causation arguments are the same as those raised in his arguments about the sufficiency of the evidence. We find these arguments are similarly without merit when examining the weight of the evidence. There is evidence of sufficient weight in the record to support the jury's conclusion that Dr. Wright's negligence caused or contributed to Mr. Phillips's injury and death.

¶48. We also find that the jury's deliberation time, considered alone, does not show bias against Dr. Wright that warranted a new trial. The jury retired to deliberate on their verdict at 4:06 p.m. and returned with a verdict at 5:16 p.m. the same day. There is no legal yardstick to measure how much time a jury must deliberate before returning its verdict. Short deliberations do not automatically demonstrate bias or prejudice. *Ekornes-Duncan v. Rankin Med. Ctr.*, 808 So. 2d 955, 962 (Miss. 2002) (judgment on verdict returned less than fifteen minutes after jury retired affirmed.) We find this issue is without merit.

V. **WHETHER THE TRIAL COURT ERRED IN DENYING DR. WRIGHT'S AND SEMMES-MURPHY'S MOTION FOR REMITTITUR.**

¶49. Dr. Wright finally argues the circuit court erred in denying his motion for remittitur. He requests this Court enter a remittitur of an unspecified amount. He argues the five-million-dollar verdict is excessive on proof of economic damages which totaled

30

$440,511.46.[22] The Phillipses respond that the record supports both the economic and non-economic damages.

¶50.    According to section 11-1-55 of the Mississippi Code:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.

Miss. Code Ann. § 11-1-55 (Rev. 2002).  This Court articulated the standard under which it reviews a trial court's judgment on motion for additur or remittitur as follows:

> Where a trial court refuses to grant a remittitur, this Court reviews the decision for abuse of discretion.  The jury's award is not to be set aside unless it is entirely disproportionate to the injury sustained.  However, when determining the reasonableness of an award, the sky is simply not the limit.  The Court looks to see whether the verdict is so excessive it shocks the conscience evidencing a bias, passion and prejudice on the part of the jury.

*Gatewood v. Sampson*, 812 So. 2d 212, 222-223 (Miss. 2002) (citations and quotations removed.)  "It is primarily the province of the jury [and, in a bench trial, the judge] to determine the amount of damages to be awarded and the award will normally not be 'set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Foster v. Noel*, 715 So. 2d 174, 183 (Miss. 1998), *quoting **Harvey v. Wall***, 649 So. 2d 184, 187 (Miss. 1995).

---

[22]  This amount represents the $281,000 in lost income which was stipulated by the parties, 148,417.46 in medical bills and expenses, and $11,094 in funeral expenses.

¶51. We find that the trial court did not err in denying Dr. Wright's motion for a remittitur, nor will this Court grant one on appeal. The jury's verdict was just over eleven times the Phillipses' economic or special damages in the amount of $440,511.46. The jury heard proof that Mr. Phillips suffered severe, recurring headaches from March 17, 2000, until he entered the hospital again on March 28. He then lived in a persistent vegetative state for almost two years. He could not care for himself and required a breathing machine and a feeding tube to keep him alive. His wife Mary and his son Tyson, together with home health agencies, cleaned, fed and cared for Mr. Phillips and maintained his medical equipment. His wife and son required extensive training to care for Mr. Phillips adequately. All of the wrongful-death beneficiaries testified as to the relationship each had with Mr. Phillips and the hardship and suffering each endured. This Court views the evidence presented in the light most favorable to the verdict. *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 998 (Miss. 2003). We find that there is sufficient evidence to preclude a finding that the jury was influenced by bias, passion, and prejudice.

¶52. While five million dollars is a large verdict, considering this Court's standard of review, the weight of facts in this case, and the fact it is just over eleven times special damages, it is not so excessive as to shock the conscience. *Compare Gatewood*, 812 So. 2d at 223 (jury's verdict thirty-eight times special damages); *Edwards v. Ellis*, 478 So. 2d 282 (Miss. 1985) (forty times the amount of medical expenses); *Purdon v. Locke*, 807 So. 2d 373 (Miss. 2001) (fourteen times the amount of damages); *Dorrough*, 817 So. 2d at 575 (jury's verdict more than four times special damages); *Flight Line, Inc. v. Tanksley*, 608 So. 2d

32

1149 (Miss. 1992) (jury's verdict approximately four times special damages and reduced for plaintiff's negligence and failure to mitigate damages affirmed); *W.J. Runyon & Son v. Davis*, 605 So. 2d 38, 50 (Miss. 1992) (jury's verdict approximately thirteen times special damages), *overruled in part*, *J & J Timber Co. v. Broome*, 932 So. 2d 1, 4-6 (Miss. 2006). *See generally* *Choctaw Maid Farms v. Hailey*, 822 So. 2d 911 (Miss. 2002) ($5,350,162.10 actual damages verdict affirmed); *Brandon HMA, Inc. v. Bradshaw*, 809 So. 2d 611 (Miss. 2001) ($9 million actual damages verdict affirmed); *General Motors Corp. v. Jackson*, 636 So. 2d 310 (Miss. 1994) ($7 million actual damages verdict affirmed.) Therefore, we find Dr. Wright's arguments are without merit.

## CONCLUSION

¶53.    We affirm the judgment of the Circuit Court of Coahoma County on the jury's verdict in favor of the Phillipses.

¶54.    **AFFIRMED.**

**SMITH, C.J., DIAZ, P.J., EASLEY, CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  GRAVES, J., CONCURS IN RESULT ONLY.**