ISHEE, J.,
for the Court:
¶ 1. Mississippi Baptist Health Systems, Inc. d/b/a Mississippi Baptist Medical Center (Baptist), appeals the Hinds County Circuit Court jury award of $4,691,000 in favor of Jonathan Kelly and the estate of his wife, Ellen Kelly, for her wrongful death. The subject tort was committed in 2000, and the subsequent lawsuit was filed in 2001. Both occurred before the passage of Mississippi Code Annotated section 11-1-60 (Supp.2011), which capped non-economic damages in medical-malpractice lawsuits at $500,000[1] and actual economic *772 damages at $1,000,000.[2]
¶ 2. Baptist argues the following on appeal: (1) the verdict is inconsistent because the jury found the doctors who cared for Ellen were not at fault, yet the jury held the nurses and their employer, Baptist, were responsible for Ellen’s death; (2) portions of Ellen’s medical records were improperly excluded; (3) there was insufficient evidence of Ellen’s pain and suffering to support the award; (4) the verdict was contrary to the overwhelming weight of the evidence; and (5) the trial court’s award of 8% interest on the judgment was improper. Finding no errors, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 3. Ellen was a twenty-nine-year-old attorney and mother of two sons, Adam O’Malley and Jacob Kelly, ages ten and two at the time of her death. She was married to Jonathan, and the family lived outside of Monticello, Mississippi. She was employed by the Mississippi Department of Human Services in the child-support-collection division. On July 10, 2000, Ellen was admitted to Baptist to undergo a hysterectomy and a partial vulvectomy, both of which were recommended by her gynecologist, Dr. Fred Ingram. Dr. Ingram had been Ellen’s obstetrician-gynecologist since 1997. He treated her throughout her second pregnancy and delivery, which included two hospitalizations at Baptist. She was hospitalized once during the early months of her pregnancy and again in 1998 for the Caesarean-section delivery of her second child.
¶ 4. On July 10, 2000, Dr. Ingram performed Ellen’s surgery with the assistance of his partner, Dr. Doug Odom. It is undisputed Ellen regained consciousness after the surgery. However, Jonathan’s expert physician, Dr. Eric Gershwin, testified Ellen experienced an allergic reaction to the latex she was exposed to during the surgery. She complained of itching, had blisters on her lips, redness of the face, and nausea following the surgery. She was given Benadryl for the itching and Phener-gan for the nausea and vomiting. Dr. Patricia Beare, a nursing expert, testified the administration of Benadryl was a possible sign of an allergic reaction.
¶ 5. Jonathan remained with Ellen throughout the afternoon and night following her surgery and spoke to her approximately every forty-five minutes. In the early morning, Jonathan heard Ellen making “gasping [and] gurgling sounds.” When she was unable to respond to Jonathan, he contacted her nurse. The nurse then called Dr. John Brooks, an emergency physician. Dr. Brooks immediately in-tubated Ellen. She had also developed ventricular tachycardia, a condition where the heart is unable to maintain its rhythm, and she lost her pulse. Due to the intubation, Ellen was unable to breathe on her own. Thereafter, she was placed on a ventilator and transferred to the intensive care unit (ICU) at Baptist. Ellen had no neurological function following cardiac arrest and never regained consciousness. The family elected to take her off the ventilator four days later, and she died on July 14, 2000.
¶ 6. Jonathan brought a wrongful-death action in the Hinds County Circuit Court.[3] *773 He claimed Ellen died of anaphylactic shock due to the doctors’ and Baptist’s negligent failure to discover Ellen was allergic to latex and to thereafter take proper precautions. He asserted Ellen died as a result of the latex allergy, which caused her cardiac arrest.
¶ 7. At trial, Jonathan introduced Baptist’s latex allergy policies and procedures. Those policies and procedures require that upon admission, “all patients should be assessed for [a] latex allergy.” The policy also provided that patients should be questioned about certain items which would indicate a patient was at a high risk of having a latex allergy. The “ABC Food Allergies (Avocado, Banana, Chestnuts)” are an example of one such risk. On the Pre-Procedure/Surgery Check List, prepared on July 3, 2000, by Nurse Debra Priester (Priester), Ellen’s allergies were listed as “sulfa, Lorcet, dairy products, seafood[,] and adhesive tape.” The listing “old chart sent with patient” was also marked with an “X.”
¶ 8. On a nursing admission history and assessment form, prepared a week before surgery, Ellen’s allergies were listed as “sulfa, Lorcet, all dairy products and seafood, adhesive on Band-Aids.” This form also included a subsection titled “Latex Allergy Alert” and listed various questions probing for a latex allergy. At the top of the form is the notation, “Notify MD if Yes.” A nursing expert testified this notation meant the physician should be notified if the patient answered affirmatively to any of the questions. The first question on the form asked whether “[patient] knows allerg[y] to latex.” Neither box was cheeked, but a dash was written beside “[n]o.” The second question asked whether “[patient] has ABC Allergy (Avocado, Banana, Chestnut).” “Chestnut” was circled and the “[y]es” box was checked. The next question asked whether “[patient] has had unexplained hypotension or anaphylaxis during [a] previous surgery”; neither box was checked. However, written in parentheses after the question was “had epi [and] spinal.”
¶ 9. Priester, the nurse who completed the form, testified the Latex Allergy Policy/Procedure for Baptist required a nursing assessment for each patient to minimize the risk of patients having an allergic or anaphylactic reaction to latex during a surgical procedure. The assessment intended to discover the patient’s known allergens to latex. According to the policy: “Patients included as high risk may include: ... ABC Food Allergies (Avocado, Banana, Chestnuts).” If a risk of a latex allergy was detected, the procedures required the nurse to indicate that risk on the assessment form. According to the protocol in Baptist’s Latex Allergy Policy/Procedure, if a known allergy or sensitivity to latex is identified in the patient’s admission history, an allergy sticker should be placed on the front of the patient’s chart, signage should be placed on the patient’s door, central supply and purchasing should be notified regarding any special supplies or products needed for the patient, and food and nutrition services should be notified to ensure servers would not wear latex gloves when serving the patient food.
¶ 10. Priester then testified regarding the form dated July 3, 2000. On the Latex Allergy Alert portion of the assessment regarding the question, “[patient] knows allerg[y] to latex,” Priester stated neither box was checked because Ellen did not tell her she had a latex allergy. However, she had just testified she did not have any independent knowledge of Ellen’s assessment completed some nine years before. When asked about the fact Ellen circled “chestnuts” as an allergy, Priester testified that in her opinion, “one item in and by *774 itself would not have made her necessarily allergic.” According to the policy, if a patient is deemed “high risk” as Ellen was due to her chestnut allergy, a possible latex allergy may exist and the latex-allergy protocol should be followed. Priester said she did not follow the protocol because “[Ellen] did not have a latex allergy, so I did not notify a physician.” When asked if she notified Ellen’s doctors about a potential latex allergy, she replied: “No. [Ellen] did not give me any information about being allergic to latex.” On cross-examination, Priester testified she based her opinion that Ellen was not latex sensitive on her experience in the “nursing process.” She stated it was her interpretation of the latex-allergy procedure that she should only notify a doctor if the patient acknowledged she had a known allergy to latex.
¶ 11. To further his claim that an undetected latex allergy caused Ellen’s death, Jonathan introduced a nursing admission history and assessment form from Ellen’s admission to Baptist on October 15, 1997, during the early part of her second pregnancy. The form shows Ellen answered affirmatively to the question, “[patient] knows allergfy] to latex,” and she also noted a chestnut allergy. Rebecca Dawn Davis, the nursing clinical director for Baptist, testified regarding Baptist’s latex-allergy procedures. She said on the form dated July 10, 2000, the date of the surgery in question, Nurse Christine Lang noted on the form that she had sent the old chart to surgery. Davis testified the notation meant Ellen’s record from 1997, which showed she was allergic to latex, would have been part of the record for her surgery. Davis also stated Priester did not follow Baptist’s policies and procedures when she did not fill in an answer as to whether Ellen knew she was allergic to latex. Lang, Ellen’s pre-operation nurse, stated Ellen told her she was allergic to “sulfur, Lorcet, dairy products, seafood[,] and adhesive tape.” She testified she did not consult the form Priester filled out one week before the surgery to check for possible allergies.
¶ 12. A nursing expert, Dr. Beare, opined Baptist’s nurses breached their duty of care to Ellen. Dr. Beare based this conclusion on the fact the nurses received positive responses from Ellen on latex-allergy questions but did not report it to the doctors. Significantly, Dr. Gershwin, Jonathan’s main medical expert, testified that repeated exposure to latex worsens the reaction in an individual. He opined she developed the allergy during her previous surgeries in which latex products were used. According to Dr. Gershwin, Ellen suffered all the classic signs and symptoms of a latex allergy. The symptoms included itching, redness, blisters, and nausea. He concluded Ellen’s cardiac arrest was a result of her allergy to latex. Further, Dr. Gershwin testified Ellen displayed all the signs and symptoms of an anaphylactic reaction, specifically broncho-constriction, heat arrhythmia, respiratory arrest, and a severe drop in blood pressure. The nurses’ notes, written at various times, support his testimony and show Ellen experienced labored respirations and bi-lateral breath sounds with wheezes and rhonchi.
¶ 13. Ellen’s gynecologist, Dr. Ingram, and his partner, Dr. Odom, stated Ellen did not have an allergy to latex. Dr. Ingram testified he had been Ellen’s gynecologist since 1997. He said he treated her throughout her second pregnancy and Caesarean-section, all the while using various latex products, without any adverse reaction from Ellen. Dr. Ingram took a complete history from Ellen when she initially became his patient. Although she notified him of several allergies, he testi *775 fied she never reported she had a latex allergy.
¶ 14. Dr. Ingram and Dr. Odom both testified they used their own files from their clinic instead of the hospital files for the surgery. They stated this was their standard practice. Dr. Ingram testified he had taken a complete history from Ellen, and there was no indication she was allergic to latex. He said he did not consult the hospital’s forms concerning Ellen’s allergies. Dr. Odom testified to the same.
¶ 15. Dr. Carroll McLeod, the anesthesiologist who treated Ellen at Baptist during her surgery, took a separate history from Ellen in which she indicated an allergy to adhesive tape. According to expert testimony, this indicates a possible latex allergy. However, Dr. Brooks, the emergency physician, testified, in his opinion, Ellen did not die of an adverse reaction to latex. He testified the itching was very common in post-operative patients who received morphine, as Ellen did.
¶ 16. Baptist called Dr. Richard DeSha-zo, an allergist at the University of Mississippi Medical Center in Jackson, as an expert witness. He had reviewed Ellen’s medical records, including the documents from her surgery. Dr. DeShazo concluded that Ellen did not have an allergy to latex and that she did not have an anaphylactic reaction to latex.
¶ 17. After hearing all of the testimony, the jury returned a verdict finding Baptist liable for Ellen’s death through the negligence of its nurses. The jury exonerated the doctors. It further held Baptist’s nurses were negligent by failing to notify the doctors of Ellen’s latex allergies and for failing to follow the hospital’s latex-allergy procedures. The jury awarded $516,000 to the wrongful-death beneficiaries and $4,175,000 to Ellen’s estate. The trial judge entered a final judgment on July 1, 2009, awarding an interest rate of 8% beginning on June 2, 2009, the date of the jury’s verdict. From this ruling, Baptist appeals.
DISCUSSION
¶ 18. The essential elements to establish a medical-malpractice claim are:
(1) the existence of a duty on the part of a physician to conform to the specific standard of conduct, (2) the applicable standard of care, (8) the failure to perform to that standard, (4) that the breach of duty by the physician was the proximate cause of the plaintiffs injury, and (5) that damages to the plaintiff resulted.
Patterson v. Tibbs, 60 So.3d 742, 753 (¶ 41) (Miss.2011) (quoting Estate of Northrop v. Hutto, 9 So.3d 381, 384 (¶ 9) (Miss.2009)).
I. INCONSISTENT VERDICT
¶ 19. Baptist argues it is entitled to a new trial because the jury’s verdict shows “inescapable inconsistency.” Under this argument, Baptist asserts that because the doctors had a duty to take a proper history from Ellen and the jury exonerated the doctors, the jury could not find the nurses were negligent for failing to follow hospital procedures regarding latex allergies.
¶ 20. Jonathan correctly asserts Baptist never raised this issue before the trial court; thus, we should not consider the argument on appeal. Case law clearly establishes “[ijssues not raised at trial cannot be raised on appeal.” Fitch v. Valentine, 959 So.2d 1012, 1021 (¶ 19) (Miss. 2007) (citation omitted). After a review of Baptist’s motion for a judgment notwithstanding the verdict or, alternatively, a motion for a new trial, we can find no instance where Baptist raised this issue before the trial court. In its reply brief on appeal, Baptist cites to a portion of one *776 sentence as support for its position that the issue was placed before the trial court. That sentence fragment reads, “the jury[,] surmising that the physicians had not been properly informed[,] exonerated those physicians and casted [sic] [Baptist] in a sole fault contrary to Your Honor [sic], so we submit to the law and the facts.” Giving this statement a plain reading rather than the strained one urged by Baptist, we cannot find these few words and nothing more placed this issue before the trial court. Therefore, we conclude the issue is procedurally barred.
¶ 21. Procedural bar notwithstanding, we find there is nothing inconsistent in the verdict. The doctors and the nurses owed Ellen different duties. Thus, the jury's finding the doctors did not breach their duty of care but the nurses did breach their duty of care was consistent. Furthermore, the jury instructions enumerated the different duties.
¶ 22. Jury Instruction 15 set forth the duties the Baptist nurses owed to Ellen. The instruction advised the jury if they found the nurses did the following and that such negligence caused or contributed to injury or damage to Ellen bringing about her eventual death, then the jury was to return a verdict against Baptist:
(1) failed to properly assess or identify Ellen Kelly as at risk for latex allergy or sensitivity, if any, and/or
(2) failed to properly inform the treating physicians that Ellen Kelly was at risk for [a] latex allergy, if any, and/or
(3) failed to implement the Mississippi Baptist Medical Center’s Policies and Procedures in regard to latex allergies or sensitivity, if any
Thus, the jury was informed about the nurses’ separate duties. Those duties included the independent duty to assess Ellen for a latex allergy or sensitivity; the duty to notify the doctors of any allergy or sensitivity; and the duty to implement the latex-alert procedures of Baptist, which would ensure Ellen was not exposed to latex. Dr. Beare testified regarding the proper standard of care employed when assessing a patient for latex allergies; these duties are generally required and are not solely required by Baptist’s policies. Those duties include: reviewing past records; reviewing pre-admission assessments; thoroughly filling out admission forms; and, when necessary, notifying the doctor about potential allergies. Under the protocol of Baptist’s latex-alert procedures, the nurses were required to place an allergy sticker in Ellen’s chart and a sign on her door noting the latex allergy. The nurses were also required to notify central supply that all products used during Ellen’s operation must be latex free. These are separate duties from those required of the doctors who performed Ellen’s surgery. Dr. Beare testified Baptist’s nurses breached these independent duties on a variety of occasions.
¶ 23. The doctors owed a different set of duties to Ellen, which were outlined in several jury instructions. Jury Instruction 18 prescribed one set of the duties owed to Ellen by Dr. Ingram and Dr. Odom. That instruction informed the jury the doctors were negligent if they:
(1) failed to obtain a complete clinical history and identify Ellen Kelly as at risk for latex if any, and/or
(2) failed to properly diagnose that Ellen Kelly suffered from a latex allergy or sensitivity, if any, and/or
(3) failed to take precautions for Ellen Kelly’s latex allergy or sensitivity, if any, and/or
(4) failed to diagnose the allergic reaction to latex products, if any
*777 ¶24. Jury Instruction 19 advised the jury to find the doctors negligent if the evidence showed:
Dr. Fred Ingram and/or Doug Odom in their care and treatment of Ellen Kelly failed to exercise that degree of reasonable diligence, skill, care, competence, and prudence ordinarily exercised by minimally-eompetent physicians throughout the United States in like and similar circumstances, then Dr. Ingram and/or Dr. Odom were negligent. If you further find that said negligence, if any proximately caused, or proximately contributed to cause, injury to Ellen Kelly, and her eventual death, then you should return a verdict in favor of the Kelly family against Dr. Fred Ingram and Ob-Gyn Clinic of Jackson, PLLC and/or Dr. Doug Odom [of the] Ob-Gyn Clinic of Jackson and assess their damages, if any.
¶ 25. Jury Instruction 21 explained the standard of care and skill applicable to physicians. That instruction further stated if the jury found the doctors acted with “such reasonable diligence, skill, competence[,] and prudence as is practiced by minimally competent obstetricians and gynecologists throughout the United States who had available to them the same general facilities, services, equipment[,] and options as Dr. Ingram and Dr. Odom had on July 10, 2000”; then the doctors complied with the requisite standard of care in treating Ellen, the doctors’ care did not proximately cause her death, and the jury should find in favor of the doctors.
¶ 26. Baptist argues the nurses’ failure to conform to the appropriate standard of care did not proximately cause Ellen’s death because the doctors admitted they performed their own assessment of Ellen and used their own charts during surgery. However, the nurses were required to take other precautions outside of making notations within the chart. The nurses should have placed a sign on' her door and a sticker on her chart noting the allergy, among other duties. Additionally, Dr. Beare testified that under the proper standard of care, if the nurse noticed a latex allergy was indicated on the form, the nurse should have informed the doctor. Dr. Gershwin testified on cross-examination he had sympathy for the doctors. He stated:
They depended on the nursefs]. The nurse[s] let them down at Baptist Hospital. The doctors then used latex products .... So unwittingly, they were pulled into this. Yes. They should have been aware of her history before. She filled it out and they gave it, but the gatekeeper was in fact the Baptist Hospital.
There is no evidence to suggest that had the nurses followed the proper standard of care and placed a sticker on the chart or notified the doctors about Ellen’s latex allergy the doctors would not have heeded their warnings. Because the jury found the nurses had not informed the doctors of the allergy, it is consistent that the jury also found the doctors had no notation of Ellen’s allergy to latex in the record. Baptist’s policy made the nurses the gatekeepers for patients’ allergies by developing a latex-allergy policy and requiring the nurses to conduct a latex-allergy assessment prior to a patient’s surgery. Considering the decision to assess fault is one for the jury, we find no error in its assessment of fault to Baptist and not to the doctors. Accordingly, this issue is without merit.
II. EXCLUDED PORTIONS OF MEDICAL RECORDS
¶ 27. We review a trial court’s decision to admit or exclude evidence under an abuse-of-discretion standard. Whitten v. Cox, 799 So.2d 1, 13 (¶ 27) *778 (Miss.2000). Baptist argues Ellen’s medical records from her prior hospitalizations should not have been excluded from evidence. Baptist sought to introduce Ellen’s records from King’s Daughters Hospital-Brookhaven for admissions dated September 11, 1989; June 28, 1999; April 13, 1998; and September 3, 1994. Baptist also sought to introduce the records of Dr. Joseph S. Moak of Brookhaven, records from a 1989 Caesarean section at King’s Daughter’s Hospital-Brookhaven, and records from emergency room visits from 1994 and 1999, which were intended to show that Ellen did not have an allergic reaction to alleged latex exposure.
¶ 28. The trial judge found the documents were not relevant because Baptist offered nothing to show Ellen was exposed to latex during any of these medical visits nor did it offer any expert testimony about Ellen’s latex exposure during those visits. Importantly, the medical records from six of Ellen’s hospitalizations at Baptist were placed in evidence. The records began in October 1997 and continued through her final hospitalization on July 14, 2000. The trial judge allowed Baptist to mark the records for identification purposes and to use them when questioning witnesses. We find the trial judge did not abuse his discretion. Accordingly, this issue is without merit.
III. ASSESSMENT OF DAMAGES
¶ 29. In its next claim, Baptist makes several arguments against the jury’s assessment of damages, ultimately asserting a new trial should be held on damages. Baptist argues the following three main issues: (1) the jury incorrectly assessed the value of household services; (2) the jury incorrectly assessed Ellen’s medical expenses, funeral expenses, and compensation for Ellen’s physical and emotional pain and suffering; and (3) the anesthesiologist, Dr. McLeod, should have been listed as a responsible party on the jury’s damage form because he bore “potential responsibility” for Ellen’s injuries.
¶ 30. Mississippi’s wrongful-death statute allows recovery of damages in the amount the jury determines to be just, taking into consideration all damages of every kind to the decedent and all damages of every kind to any and all interested parties in the suit. Miss.Code Ann. § 11-7-13 (Rev.2004). This statutory language provides for (1) medical and funeral costs; (2) the present net cash value of the life expectancy of the deceased if older than the beneficiaries; (3) the loss of the companionship and society of the decedent; (4) the pain and suffering of the decedent between the time of injury and death; and (5) punitive damages, when appropriate.[4] See Jesco, Inc. v. Whitehead, 451 So.2d 706, 710 (Miss.1984); Sheffield, v. Sheffield, 405 So.2d 1314, 1318 (Miss.1981).
¶ 31. “It is primarily the province of the jury ... to determine the amount of damages to be awarded!,] and the award will normally not be ‘set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount!,] and outrageous.’” Estate of Jones v. Phillips ex rel. Phillips, 992 So.2d 1131, 1150 (¶ 50) (Miss.2008) (quoting Foster v. Noel, 715 So.2d 174, 183 (¶ 56) (Miss.1998)). However, this Court may order a new trial if we find the damages are “excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.” Miss. Code Ann. § 11-1-55 (Rev.2002).
*779 ¶ 32. Finally, all three of Baptist’s challenges to the damages awarded involve jury instructions; thus, we state the familiar standard of review that the instructions must be read as a whole. Entergy Miss., Inc. v. Bolden, 854 So.2d 1051, 1054 (¶ 6) (Miss.2003). Once the jury has returned a verdict, we will not direct judgment be entered to the contrary unless we find, given the evidence as a whole and taken in the light most favorable to the verdict, no reasonable hypothetical juror could have found as the jury found. Miss. Power & Light Co. v. Cook, 832 So.2d 474, 478 (¶ 5) (Miss.2000). However, an instruction need not be given that incorrectly states the law, is covered fairly in another instruction, or is without foundation in the evidence. Heidel v. State, 587 So.2d 835, 842 (Miss.1991) (citations omitted).
A. VALUE OF HOUSEHOLD SERVICES
¶33. First, Baptist argues Jonathan provided no evidence regarding the actual value of Ellen’s household services. Baptist makes this argument despite the fact it cross-examined Jonathan’s expert on the value of Ellen’s household services.
¶ 34. As with all damages, Jonathan bore the burden of showing the amount of the loss of Ellen’s household services. Puckett Mach. Co. v. Edwards, 641 So.2d 29, 36 (Miss.1994). James Elbert Bivins, a Jackson CPA who specializes in valuation analysis, testified as an expert regarding the value of Ellen’s household services. Baptist did not object to Bivins testifying. Bivins explained the physical activities a mother does for her family, such as cleaning the house, traveling, buying groceries, and taking care of the children, can be quantified. He used federal government statistics and considered inflation in arriving at his figure.
¶ 35. Bivins testified Ellen was twenty-nine-years old when she died and had a life expectancy of seventy-four years. He also considered the fact she provided care to her two small children. However, he adjusted his figures to take into account less care would be required as the children aged. Bivins testified the appropriate figure for the loss of her household services was $992,109. Baptist offered no expert testimony to dispute Bivins’s figure. As with all witnesses, the jury was entitled to believe or disbelieve Bivins’s testimony. See Indep. Life & Acc. Ins. Co. v. Mullins, 252 Miss. 644, 651, 173 So.2d 663, 665 (1965). In this instance, the jury chose to believe the expert. We find no error in the jury’s valuation of the household services.
B. MEDICAL EXPENSES, FUNERAL EXPENSES, AND COMPENSATION FOR PHYSICAL AND EMOTIONAL PAIN AND SUFFERING
¶ 36. Baptist argues Jonathan provided no substantial evidence of Ellen’s conscious pain and suffering. Baptist does not dispute the jury award for Ellen’s funeral and medical expenses totaling $29,604.52. As previously discussed, expert testimony established the family lost $992,109 for the value of Ellen’s household services. Dr. Glenda Glover, dean of the business college at Jackson State University, who is also a certified public accountant and attorney, testified regarding the amount of Ellen’s lost wages. Using wages from the year of Ellen’s death and considering her work-life expectancy, Dr. Glover testified Ellen’s future lost wages totaled $1,415,881. Baptist did not offer any expert testimony to dispute this figure.
¶ 37. The actual damages awarded include: $29,604.52 for funeral and medical expenses; $992,109 for the loss of Ellen’s household services; and $1,415,880 for El *780 len’s lost wages. Therefore, the actual damages awarded totaled $2,437,934.52. The total amount of the damages awarded by the jury totaled $4,691,000. Thus, the jury awarded $2,253,065.48 for pain and suffering.
¶ 38. As previously stated, Mississippi’s wrongful-death statute allows for recovery of damages by the survivors for the pain and suffering of the decedent from the time of injury until their subsequent demise. Baptist cites M & M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts, 531 So.2d 615, 621 (Miss.1988), as support for the proposition the plaintiff has the burden of proving survival and consciousness after the wrongful injury and the burden is not sustained “unless there is ‘substantial proof of consciousness after the [injury].” Baptist claims Jonathan submitted no evidence to show Ellen ever regained consciousness. Case law states pain and suffering damages are measured from “the time of injury and death[.]” McGowan v. Estate of Wright, 524 So.2d 308, 311 (Miss.1988). Baptist incorrectly states the “time of injury” was “the time between her cardiorespiratory arrest/resuscitation on July 11, 2000, and her death four days later.” Clearly the “injury” was the surgery during which she was exposed to latex. It is uncontradicted that Ellen regained consciousness after the surgery. The jury found during this period that she suffered an allergic reaction, which included itching, redness of the face, blisters on the lips, and nausea. As her reaction progressed, she struggled to breathe due to the anaphylactic reaction. The reaction caused Ellen’s bronchoconstriction, heart arrhythmia, respiratory arrest, and a severe drop in blood pressure. There is no doubt she suffered physical agony and mental anguish as she struggled to breathe. In fact, she had to be intubated in order to breathe. She also experienced heart arrhythmia, which is typically characterized by severe chest pain. As her reaction continued, the flow of blood to her brain decreased, which led to extreme swelling of her brain and ultimately a brain stroke and infarction. She remained in the ICU for four days until her family decided to end her suffering and disconnect the ventilator.
¶ 39. “Awards fixed by jury determination are not merely advisory and will not under the general rule be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount[,] and outrageous.” Jack Gray Transp., Inc. v. Taylor, 725 So.2d 898, 899 (¶ 5) (Miss.1998) (citations omitted). Our courts have repeatedly recognized the amount of damages awarded is primarily a question for the jury. S. Cent. Bell Tel. Co. v. Parker, 491 So.2d 212, 217 (Miss.1986).
¶ 40. Furthermore, Jonathan points out the amount for pain and suffering is less than the actual damages. The Mississippi Supreme Court has upheld damages with far greater disparities than the award in this case. Estate of Jones v. Phillips, 992 So.2d 1131, 1150 (¶ 52) (Miss.2008) (upholding a $5,000,000 verdict and finding although economic damages only totaled $440,511.46, the amount of the verdict was not so excessive as to shock the conscience); Gatewood v. Sampson, 812 So.2d 212, 223 (¶¶ 25-27) (Miss.2002) (upholding jury verdict of $308,000 in compensatory damages although proof of lost wages and medical expenses only totaled $8,002.50); Dorrough v. Wilkes, 817 So.2d 567, 575 (¶ 30) (Miss.2002) (upholding jury verdict of $1,500,000 although medical fees and loss of services only totaled $339,000).
¶ 41. It is clear Ellen was conscious after her surgery and experienced significant pain and suffering. The jury heard *781 the testimony and rendered damages for pain and suffering in the amount of $2,253,065.48. We do not find the amount outrageous or unreasonable; therefore, we find this issue is without merit.
C. DR. MCLEOD, ANESTHESIOLOGIST, AS A RESPONSIBLE PARTY
¶ 42. Baptist argues the trial court erred by not allowing Dr. McLeod, Ellen’s anesthesiologist, to be listed as a responsible party for the jury to consider in awarding damages. However, there was no testimony even offered to suggest Dr. McLeod had deviated from the standard of care and proximately caused Ellen’s death. In order to have an instruction granted, there must be some supporting evidence presented. Canadian Nat’l Ill. Cent. R. Co. v. Hall, 953 So.2d 1084, 1101 (¶ 62) (Miss.2007). Furthermore, Baptist never offered an instruction at trial that would have allowed the jury to find Dr. McLeod partially liable. Baptist did proffer a proposed instruction that would have added a blank space where the jury could have assessed fault “as to other parties not present.” However, the trial court denied the jury instruction. We find no merit to this argument.
IY. MOTION FOR A NEW TRIAL
¶ 43. Baptist claims it is entitled to a new trial because the jury’s verdict exhibits bias, passion, prejudice, and confusion all contrary to the overwhelming weight of the evidence. Baptist cites a portion of Poole ex rel. Poole v. Avara, 908 So.2d 716, 726-27 (¶ 25) (Miss.2005) for the familiar standard used by an appellate court to determine if a new trial is appropriate. The Mississippi Supreme Court stated:
A new trial may be granted in a number of circumstances, such as when the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty jury instructions, or when the jury has departed from its oath[,] and its verdict is a result of bias, passion, and prejudice.
Id. (quoting Shields v. Easterling, 676 So.2d 293, 298 (Miss.1996)). However, Baptist fails to cite the rest of the quote from Poole, which reads:
This Court will reverse a trial judge’s denial of a request for new trial only when such denial amounts to an abuse of that judge’s discretion. The existence of trial court discretion, as a matter of law and logic, necessarily implies that there are at least two differing actions, neither of which if taken by the trial judge will result in reversal.

Id.

¶ 44. Baptist claims the jury was confused when it awarded the amount of damages for pain and suffering. Baptist uses a note passed to the trial court by the jury to support its argument. The note reads: “The first question is, how are we to determine the amount for each family member? And the second question is, can we say that the children get this and husband gets this?” The trial court correctly told the jury to follow the instructions it had been given. There is nothing in the final judgment award by the jury that shows any confusion.
¶ 45. Baptist also asserts the verdict is against the overwhelming weight of the evidence. However, we find Jonathan presented two qualified medical experts who outlined the standard of care and testified regarding Baptist’s nursing staffs failure to conform to that standard of care. This issue is without merit.
V. INTEREST RATE
¶ 46. In their final issue on appeal, Baptist challenges the interest rate *782 awarded on the judgment. Baptist argues the trial court erroneously awarded interest at the rate of 8% per annum, compounded annually, to accrue as of June 2, 2009, the date of the verdict. Baptist also disputes the interest rate of 8%. Baptist argues when the interest rate is applied to the judgment amount of $4,691,000, the interest accrues at $1,028.16 per day. This means in the twenty-nine days between the jury’s verdict and the entry of final judgment, interest accrued in the amount of $29,816.76. Baptist states that before a final and appealable judgment was entered on October 18, 2009, the interest amount had climbed to $137,774.03.
¶47. Baptist challenges the date on which interest should have begun to accrue. Baptist argues the trial court erroneously awarded “interest at a rate of 8 percent (%) per annum, compounded annually, beginning to accrue as of June 2, 2009.” Baptist claims the jury verdict was returned on June 2, 2009, and Baptist moved to amend the interest portion of the judgment on July 8, 2009. Thus, the judgment did not become final and appealable until the trial court denied Baptist’s motion on October 14, 2009. Baptist claims the trial court erred when it awarded prejudgment interest retroactively to the date of the judgment.
¶ 48. Mississippi Code Annotated section 75-17-7 (Rev.2009), governs the application of interest rates to judgments. That section provides:
All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.
Miss.Code Ann. § 75-17-7 (emphasis added).
¶ 49. Baptist claims while section 75-17-7 requires a judgment to bear interest, the statute also requires the trial court to be fair in its assessment of interest. Baptist argues: “It is simply not fair for a[c]ir-cuit [cjourt to order the accumulation of a massive amount of interest while the [cjourt itself fails to enter an appealable judgment.”
¶ 50. The purpose of an award of interest is to make the aggrieved plaintiff whole, that is, to fully compensate the party. 47 C.J.S. Interest & Usury § 12 (2005). “Additionally, statutory interest guarantees that the successful plaintiff will receive prompt payment, and prevents the judgment debtor from profiting at the expense of the plaintiff.” Id. Stated another way, “[ijnterest on a monetary award is designed to compensate for the loss that results when a claimant is deprived of the use of money to which she was entitled from the moment that liability was determined.” 44B Am. Jur. 2d Interest and Uswry § 38 (2007). Traditionally, the supreme court has allowed interest to run from the date of the tort. See Phillips Distribs., Inc. v. Texaco, Inc., 190 So.2d 840, 842 (Miss.1966) (Texaco assessed interest on the judgment from the date of the tort of conversion.). Furthermore, the statute provides the only limit regarding the time when interest can be awarded is that it can “in no event [be] prior to the filing of the complaint.” Miss.Code Ann. § 75-17-7. Thus, the trial court could have allowed the interest to begin anytime after the date on which the complaint was filed, August 31, 2001.
¶51. Next, Baptist disputes the percentage of interest awarded, stating the trial court abused its discretion in awarding 8% interest. Baptist notes prior to its amendment in 1989, section 75-17-7 re *783 quired a judgment interest rate of 8%, but now the rate is left to the trial court’s discretion. Baptist argues the trial court should not “blindly rely” on the previous rate.
¶ 52. Baptist points out that federal judgments pursuant to 28 U.S.C. section 1961(a) (2006) bear interest calculated from the date of the entry of the judgment, at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System for the calendar week preceding the judgment. Indeed, Baptist asserts the interest rate using the federal figures on June 26, 2009, was 0.48%. Further, Baptist claims the prime rate on the date of the entry of the judgement according to the Federal Reserve Selected Interest Rates was 3.25%.
¶ 53. Nonetheless, the right to post-judgment interest is a statutory right and within the discretion of the ruling judge. U.S. Fid. & Guar. Co. v. Estate of Francis ex rel. Francis, 825 So.2d 38, 50 (¶ 38) (Miss.2002). Section 75-17-7 provides that interest “shall” be awarded. In Houck v. Ousterhout, 861 So.2d 1000, 1003 (¶ 14) (Miss.2003), Timothy Houck argued interest on child support arrearages at 8% “does not appear to be fair in today’s economy.” The supreme court rejected that argument and upheld the chancellor’s discretion in determining the rate of interest. Id. at (¶ 15). See Adams v. Adams, 591 So.2d 431, 436 (Miss.1991) (appellate court found chancellor erred in not awarding interest on past-due child support and court assessed interest at 8%).
¶ 54. As such, we cannot agree with Baptist’s argument that 8% interest was “simply not fair” and an abuse of discretion. Accordingly, we find no error in the trial court’s award of interest at the rate of 8% to run from the date of the jury verdict. This issue is without merit.
¶ 55. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING, P.J., ROBERTS AND RUSSELL, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS, J., AND JOINED IN PART BY ISHEE, J. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION. GRIFFIS, P.J., MYERS AND BARNES, JJ., NOT PARTICIPATING.

. H.B. 2, 2002 Leg., 3d Ex.Sess., § 7 (Miss. 2002) (cap increased to $750,000 in 2011 and to $1 million in 2017) (codified at Miss.Code Ann. § 11-1-60).

. H.B. 13, 2004 Leg., 2d Ex.Sess. (Miss.2004), amending Miss.Code Ann. § 11-1-60.

. In addition to Baptist, Jonathan named as defendants, Dr. Ingram (gynecologist), Dr. Odom (gynecologist), OB-Gyn Clinic of Jackson, PLLC (clinic of Dr. Ingram and Dr. Odom), Dr. Carroll McLeod (anesthesiologist), and Dr. Timothy D. Cannon (pulmonologist). Baptist is the only defendant involved in this appeal.

. The parties agreed at the close of evidence that punitive damages would not be sought.