# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01869-SCT

*GEORGIA PACIFIC CORPORATION*

*v.*

*COOK TIMBER COMPANY, INC.*

### ON MOTION FOR REHEARING

DATE OF JUDGMENT: 04/16/2013
TRIAL JUDGE: HON. SAMAC S. RICHARDSON
TRIAL COURT ATTORNEYS: JOSEPH E. ROBERTS, JR.
RANCE N. ULMER
EUGENE COURSEY TULLOS
THOMAS L. TULLOS
ANN RUSSELL CHANDLER
JAMES H. HEIDELBERG
JOE SAM OWEN
STEPHEN WALKER BURROW
COURT FROM WHICH APPEALED: JASPER COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: STEPHEN WALKER BURROW
JAMES H. HEIDELBERG
JOE SAM OWEN
ATTORNEYS FOR APPELLEE: JOSEPH E. ROBERTS, JR.
ANN R. CHANDLER
RANCE N. ULMER
EUGENE COURSEY TULLOS
THOMAS L. TULLOS
NATURE OF THE CASE: CIVIL - CONTRACT
DISPOSITION: ON DIRECT APPEAL: REVERSED AND
RENDERED. ON CROSS-APPEAL:
AFFIRMED IN PART, REVERSED IN PART
AND REMANDED - 06/30/2016
MOTION FOR REHEARING FILED: 03/31/2016
MANDATE ISSUED:

EN BANC.

DICKINSON, PRESIDING JUSTICE, FOR THE COURT:

¶1.     The motion for rehearing filed by Georgia Pacific Corporation is denied.  The motion for rehearing filed by Cook Timber Company, Inc., is denied.  The previous opinions issued in this case are withdrawn, and these opinions are substituted therefor.

¶2.     Cook Timber Company sued Georgia Pacific Corporation, claiming breach of contract and antitrust violations, both unilaterally and through a conspiracy with other market participants.[1]  The circuit judge granted Georgia Pacific a directed verdict on Cook Timber's conspiracy and breach-of-contract claim, but the jury returned a verdict for Cook Timber on its unilateral antitrust claim.  Because Cook Timber failed to present sufficient evidence to support its unilateral antitrust claims, we reverse the jury's verdict on that claim.  We also affirm the circuit judge's decision to grant Georgia Pacific a directed verdict on the conspiracy claim.  But we reverse the directed verdict on Cook Timber's breach-of-contract claim, and we remand for a new trial on that claim.

## FACTS AND PROCEDURAL HISTORY

¶3.     Cook Timber, a logging company based in Bay Springs, Mississippi, has been in operation since 1983.  Georgia Pacific is a national wood-processing company with several facilities in Mississippi.  In southeast Mississippi, Georgia Pacific operated the Leaf River Group. This group consisted of five mills, including the Taylorsville Plywood Plant, Taylorsville Chip Mill, Bay Springs Sawmill, New Augusta Sawmill, and the Leaf River Pulp Mill.

---

[1] This case involves additional plaintiffs and defendants, but all parties agreed only Cook Timber and Georgia Pacific would proceed to trial.

¶4. In 1983, Cook Timber entered into a contract with Georgia Pacific, and from then until 2000, Cook Timber worked exclusively with Georgia Pacific. Eighty to ninety percent of Cook Timber's wood was hauled to the Taylorsville Plywood Plant and Bay Springs Sawmill. The remainder was hauled to the Leaf River Pulp Mill. In March 2000, Georgia Pacific notified Cook Timber by letter that its Leaf River Pulp Mill no longer would receive any pine pulpwood deliveries from Cook Timber. Cook Timber then filed this suit.

¶5. After the circuit judge granted a directed verdict on Cook Timber's breach-of-contract and conspiracy claims, the jury returned a verdict for both actual and punitive damages against Georgia Pacific. Georgia Pacific appealed, arguing that the circuit court had erred by admitting the testimony of Cook Timber's expert witness, Dr. William Shughart; that Cook Timber had presented insufficient evidence to prove its unilateral antitrust claim; that the circuit court had improperly instructed the jury on the elements of Cook Timber's unilateral antitrust claim; and that the circuit court had erred by permitting the jury to consider punitive damages for the antitrust violation. Cook Timber cross-appealed the directed verdicts on its breach-of-contract and conspiracy claims.

¶6. We find that Cook Timber failed to prove that Georgia Pacific committed unilateral antitrust violations. We also affirm the circuit court's directed verdict on the conspiracy claim. But we find that Cook Timber presented sufficient evidence to survive a directed verdict on its breach-of-contract claim, and we reverse and remand for a new trial on that claim.

**ANALYSIS**

3

### Cook Timber's Section 75-21-3 Claim

¶7. Cook Timber's three claims center on Georgia Pacific's efforts to cut the cost it pays timber suppliers for wood. Each claim rests on a distinct legal theory. The circuit judge allowed the jury to consider only one of the three legal theories. That claim was brought under Mississippi Code Section 75-21-3.

¶8. There is an important difference between Cook Timber's claim under Mississippi Code Section 75-21-3—on which the jury based its verdict—and Mississippi Code Section 75-21-1—on which the circuit judge granted a directed verdict. Both statutes concern what can be characterized broadly as antitrust regulations. Section 75-21-1, which regulates actions by trusts or combines, states:

> A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others [when used to engage in certain prohibited business practices.][2]

¶9. Section 75-21-3, on the other hand, regulates the conduct of "[a]ny corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall" engage in certain prohibited business practices.[3] In other words, Section 75-21-1 prohibits agreements between market participants to engage in the prohibited practices, while Section 75-21-3 prohibits unilateral action by a market participant to engage in the prohibited practices.

---

[2] Miss. Code Ann. § 75-21-1 (Rev. 2009).

[3] Miss. Code Ann. § 75-21-3 (Rev. 2009).

4

¶10.    With regard to Section 75-21-3, on which the jury based its verdict, Cook Timber

failed to present sufficient evidence.  That section states:

> Any corporation, domestic or foreign, or individual, partnership, or association
> of persons whatsoever, who, with intent to accomplish the results herein
> prohibited or without such intent, shall accomplish such results to a degree
> inimical to public welfare, and shall thus:

> (a)    Restrain or attempt to restrain the freedom of trade or
>        production;

> (b)    Or shall monopolize or attempt to monopolize the
>        production, control or sale of any commodity, or the
>        prosecution, management or control of any kind, class or
>        description of business;

> (c)    Or shall engross[,] forestall or attempt to engross or
>        forestall any commodity;

> (d)    Or shall destroy or attempt to destroy competition in the
>        manufacture or sale of a commodity, by selling or
>        offering the same for sale at a lower price at one place in
>        the state than another or buying or offering to buy a
>        commodity at a higher price at one place in the state than
>        another, differences of freight and other necessary
>        expenses of sale and delivery considered;

> (e)    Or shall destroy or attempt to destroy competition by
>        rendering any service or manipulating, handling or
>        storing any commodity for a less price in one locality
>        than in another, the differences in the necessary expenses
>        of carrying on the business considered, shall be deemed
>        and held a trust and combine within the meaning and
>        purpose of this section, and shall be liable to the pains,
>        penalties, fines, forfeitures, judgments, and recoveries
>        denounced against trusts and combines and shall be
>        proceeded against in manner and form herein provided,
>        as in case of other trusts and combines.

> It shall be sufficient to make out a prima facie case of a violation of
> subdivision (e) of this section to show lower charge for the service therein

5

mentioned in one locality than another, or to show a higher price paid for a commodity in one locality than another, differences of freight and other necessary expenses of operating business considered.[4]

¶11.    Cook Timber's case essentially boiled down to five pieces of evidence: (1) references to Georgia Pacific's "Project Hawker" price-reduction effort, (2) Georgia Pacific's decision to purchase timber only from suppliers who provided the most consistent prices, (3) Georgia Pacific's decision to stockpile its timber inventory so it could refuse to purchase timber when prices were too high, (4) Georgia Pacific's decision to publish the prices it paid for timber, and (5) Georgia Pacific's contractual right to cull wood not meeting its quality specifications. This evidence, even when viewed in the light most favorable to the verdict, does not support it.

¶12.    Conduct that violates Section 75-21-3 must fall under at least one of subsections (a) through (e).[5]    Clearly, subsections (d) and (e) are inapplicable because both address differential pricing between localities in the state, and Cook Timber does not allege that Georgia Pacific engaged in this practice.[6]

¶13.    Subsection (b) prohibits a market participant from "monopoliz[ing] or attempt[ing] to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business."[7] Monopoly is defined

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

6

as "1. [c]ontrol or advantage obtained by one supplier or producer over the commercial market within a given region. 2. The market condition existing when only one economic entity produces a particular product or provides a particular service."[8] No evidence supports a conclusion that Georgia Pacific monopolized or attempted to monopolize its industry. In fact, this case does not involve claims about Georgia Pacific's industry itself, but rather from whom it decided to purchase raw material. And the existence of competitors forms the basis of some of Cook Timber's claims.

¶14. This leaves subsections (a) and (c). Subsection (a) prohibits a business from "[r]estrain[ing] or attempt[ing] to restrain the freedom of trade or production."[9] With regard to the restraint-of-trade provision, this Court has said that "our anti-trust statute was only intended to embrace within its provisions those contracts in restraint of trade which were invalid as against public policy before the enactment of said statute."[10] No authority supports the view that, before this statute's adoption, businesses were prohibited from seeking to purchase material for the lowest possible cost.

¶15. Finally, subsection (c) prohibits a business from "engross[ing], forestall[ing] or attempt[ing] to engross or forestall any commodity."[11] Under an older version of the statute, this Court held that the statute prevented businesses from fixing prices for commodities

---

[8] *Monopoly*, Black's Law Dictionary 862 (abr. 9th ed.).

[9] Miss. Code Ann. § 75-21-3(a) (Rev. 2009).

[10] **Brown v. Staple Cotton Coop. Ass'n**, 132 Miss. 859, 96 So. 849, 854 (1923) (citing **Yazoo & M.V.R. Co. v. Crawford**, 107 Miss. 355, 65 So. 462 (1914)).

[11] Miss. Code Ann. § 75-21-3(c) (Rev. 2009).

outside the law of supply and demand.[12]  For instance, that prohibition precluded an agreement between oyster sellers always to sell oysters at a fixed price.[13]  While the current version of the statute does not contain the phrase price fixing, engross, in the antitrust sense, means "to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price."[14]  But this case involves Georgia Pacific's actions as a consumer, not a seller.  It cannot be said Georgia Pacific attempted to corner a market when it is not acting as a seller in that market.  Likewise, "forestall" means "[t]o buy (goods) for the purpose of reselling at a higher price."[15]  Georgia Pacific however, attempts to purchase timber at the lowest possible price from suppliers who deliver at a consistent price, and it intends to stockpile timber in anticipation of higher future timber prices.  This strategy and conduct simply is not illegal.

¶16.    Taking all Cook Timber's proof as true, it failed to present sufficient evidence to prove any violation of Section 75-21-3, so we reverse the jury's verdict based on that statute.

---

[12] ***Barataria Canning Co. v. Joulian***, 80 Miss. 555, 31 So. 961, 962 (1902).

[13] ***Id.***

[14] *Engross*, Black's Law Dictionary 478 (abr. 9th ed.).  As it relates to buying a commodity, "engross" relates only to efforts "to corner the market and control the price" of a commodity.  *Id.*  By way of illustration, an oil company engrosses a commodity when it purchases all the oil in Mississippi for the purpose of setting the price other purchasers must pay for oil.  But, if a trucking company purchased all the oil in Mississippi—not "in an effort to corner the market and control the price" of oil, but because it needed that oil to run its trucks, it would not have engrossed the commodity.  Here, Georgia Pacific is the latter, not the former.  It purchased timber as a raw material for its products, not to participate as a seller in the timber market.

[15] *Forestall*, Black's Law Dictionary 564 (abr. 9th ed.).

Because we reverse the jury's verdict, we need not address Georgia Pacific's expert-testimony, jury-instruction, and punitive-damage claims.

### Cook Timber's Section 75-21-1 Claim

¶17.    As discussed above, while Section 75-21-3 governs unilateral conduct, Section 75-21-1 controls conduct by trusts or combines.  That section states:

> A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:

>     (a)    To restrain trade;

>     (b)    To limit, increase or reduce the price of a commodity;

>     (c)    To limit, increase or reduce the production or output of a commodity;

>     (d)    To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;

>     (e)    To engross or forestall a commodity;

>     (f)    To issue, own or hold the certificate of stock of any trust and combine within the spirit of this chapter knowing it to be such at the time of the issue or the acquisition or holding such certificate; or

>     (g)    To place the control to any extent of business or of the proceeds or earnings thereof, contrary to the spirit and meaning of this chapter, in the power of trustees, by whatever name called; or

>     (h)    To enable or empower any other person than themselves, their proper officers, agents and employees to dictate or

9

> control the management of business, contrary to the spirit and meaning of this chapter; or
>
> (i)    To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.[16]

¶18.    A threshold requirement to any violation of this statute is "a combination, contract, understanding or agreement" to commit the prohibited practices.  We find that the circuit judge properly granted a directed verdict on this claim because Cook Timber put forth insufficient evidence to establish the necessary agreement between market participants.

¶19.    We review "a trial court's grant or denial of a motion for directed verdict de novo."[17] The motion should be granted where, taking all evidence in favor of the nonmoving party as true and drawing all favorable inferences from that evidence, no reasonable juror could find that the evidence supports a verdict in favor of that party.[18]

¶20.    A price-fixing conspiracy may be established by circumstantial evidence.[19]  But, as the United States Supreme Court has said with regard to the federal Sherman Act:

> "[T]he crucial question" is whether the challenged anticompetitive conduct "stems from independent decision or from an agreement, tacit or express." While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establishing agreement or . . . itself constituting a Sherman Act

---

[16] Miss. Code Ann. § 75-21-1 (Rev. 2009).

[17] *Solanki v. Ervin*, 21 So. 3d 552, 556 (Miss. 2009) (citing *Pierce v. Cook*, 992 So. 2d 612, 616 (Miss. 2008); *Pace v. Fin. Sec. Life*, 608 So. 2d 1135, 1138 (Miss. 1992)).

[18] *Solanki*, 21 So. 3d at 559 (quoting *White v. Thomason*, 310 So. 2d 914, 916–17 (Miss.1975)).

[19] *Wagley v. Colonial Baking Co.*, 208 Miss. 815, 856, 45 So. 2d 717, 725 (1950).

offense." Even "conscious parallelism," a common reaction of "firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful."[20]

Here, the evidence at most establishes conscious parallelism.

¶21. The only evidence of conduct involving other market participants is an email between Georgia Pacific executives. That email stated that:

> I am getting reports that some of the competition is pulling their price down about as fast as we are. I am of the opinion that we are the ones making the difference and everyone else is following.
>
> . . .
>
> The difference this in this year and 1995[sic]is that all the competition is wanting to do the same thing.

¶22. This email reflects an observation and falls far short of establishing either an express or implied agreement between the parties. No reasonable juror, without engaging in speculation, could read this email to say more than that the author of the email observed that other companies were now paying lower prices for timber. So we affirm the circuit judge's decision to grant a directed verdict on this claim.

### Cook Timber's Breach-of-Contract Claim

¶23. Cook Timber's breach-of-contract claim centers on Georgia Pacific's right under its contract to cull wood that did not meet its quality specifications, to forego payment for that wood, and keep it nevertheless. It also involves Georgia Pacific's failure to maintain scale

---

[20] ***Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 553–54, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting ***Theatre Enters., Inc. v. Paramount Film Distrib. Corp.***, 346 U.S. 537, 540–41, 74 S. Ct. 257, 98 L. Ed. 273 (1954); ***Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.***, 509 U.S. 209, 227, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)).

tickets with the statutorily prescribed information and Cook Timber's claim that this creates a presumption that Georgia Pacific did not properly scale or measure the wood.

¶24.   Mississippi Code Section 75-27-113(4) provides that:

> Scale tickets shall be made available to the haulers and timber owners for each load before the close of the following business day and shall include the measured volume or weight, the standard of weight or measurement used, and the basis and amount of any deductions.

¶25.   Here, the scale tickets entered into evidence failed to include the statutorily required information.  The scale tickets from the Taylorsville Mill and the Bay Springs Mill failed to identify the basis for any dockage or the amount of the dockage. Ricky Kelly, a former Georgia Pacific manager, testified that each scale ticket had symbols representing the reasons for the dockage and also listed the weight that was docked. The three scale tickets in the record, however, do not state the basis for or the amount Cook Timber was docked.

¶26.   Cook Timber learned of the dockage amount only after it received a settlement sheet and compared the settlement sheet with the scale ticket.  So Cook Timber was deprived of this information by Georgia Pacific's conduct, and we find that this raised a rebuttable presumption that Georgia Pacific did not properly dock the wood.[21]

¶27.   Also, Cook Timber presented an email from a Georgia Pacific executive, which said:

> I am fully aware that if you come out of the gate with major cull increases you will drive up prices and drive away supply. It is your job to make these changes subtle and not make this look like an effort to lower wood costs. However, the bottom line is that we have to make these changes now.

---

[21] *DeLaughter v. Lawrence Cty. Hosp.*, 601 So. 2d 818, 821–22 (Miss. 1992).

¶28. This email could be read two ways. It might mean that Georgia Pacific had encountered a large amount of substandard wood, and the author of the email was warning against culling all of it because doing so might have appeared to have been an attempt to save money, rather than to comply with the contract. Or, it could be read as an attempt to begin slowly to cull wood that was not substandard. That is to say, reasonable jurors could read the email to say that Georgia Pacific culled wood—which it was entitled to keep without payment—not based on the wood's failure to conform to its quality specifications, but as a way to take quality wood without payment. That, coupled with the adverse presumption for failure to maintain scale tickets, provided sufficient evidence to reach a jury verdict on the breach-of-contract claim.

¶29. The existence of a contract between the parties is not disputed. Under the contract, Georgia Pacific had a right to cull and keep wood without payment, but only when the wood failed to meet its quality specifications. We find that a reasonable juror could conclude that Georgia Pacific culled wood for other reasons—mainly to lower prices—and that this breached its contract with Cook Timber. So the directed verdict was not proper on this claim.

## CONCLUSION

¶30. We find that Cook Timber failed to present sufficient evidence to sustain the jury's verdict based on a unilateral antitrust violation. So we reverse and render judgment in Georgia Pacific's favor on that claim. We find that the circuit judge properly granted a directed verdict on Cook Timber's conspiracy claim. So we affirm that ruling. Finally, we

13

find that the circuit judge erred by granting Georgia Pacific a directed verdict on Cook Timber's breach-of-contract claim. So we reverse and remand for a new trial on that claim.

¶31. **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

**WALLER, C.J., LAMAR, COLEMAN AND MAXWELL, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; RANDOLPH, P.J., JOINS IN PART. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., AND KITCHENS, J. BEAM, J., NOT PARTICIPATING.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶32. I agree Cook Timber's breach-of-contract claim should have been submitted to the jury. So the trial court's directed verdict on this claim must be reversed and this issue remanded. I also agree Cook Timber's evidence was insufficient to support its antitrust claim. Thus, the jury's verdict and damages awards also must be reversed. I write separately, however, to emphasize that punitive damages still may be recoverable on remand.

¶33. Ironically, there is—at a minimum—some question whether punitive damages even are allowed in antitrust cases. Indeed, the statute mentions only a $500 penalty. *See* Miss. Code Ann. § 75-21-9 (Rev. 2009).[22] And this court has not decided the issue.

¶34. But in contrast to an antitrust claim, it is crystal clear that a breach-of-contract action certainly carries the *potential* to recover punitive damages. ***T.C.B. Constr. Co. v. W.C. Fore Trucking, Inc.***, 134 So. 3d 701, 704 (¶9) (Miss. 2013) (discussing the evidentiary standard

---

[22] Under Section 75-21-9, "Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and *in addition a penalty of five hundred dollars ($500.00)*, by suit in any court of competent jurisdiction." (Emphasis added.)

and procedure to recover punitive damages for a breach-of-contract claim). To recover punitive damages in its breach-of-contract action, Cook Timber "must prove that the breach was the result of an intentional wrong or that a [Georgia Pacific] acted maliciously or with reckless disregard of [Cook Timber's] rights." *Id.* (quoting *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094, 1101 (¶23) (Miss. 2011)). As eight members of this court[23] emphasized in *T.C.B.*, out-and-out maliciousness *does not* have to be proven to recover punitive damages—showing reckless disregard or an intentional wrong will suffice to send the question of punitive damages to the jury. *Id.* at 705 (¶11) (emphasis added). In that case, we found a contracting party's duplicitous attempt to "to reap the benefits of its contract while at the same time denying its obligations" was enough to send the question of punitive damages to the jury. *Id.* at 705 (¶14).

¶35. Here, Cook Timber similarly has accused Georgia Pacific of trying to have its cake and eat it too, by exploiting a contract provision that allowed it to not pay for "defective" wood yet still keep it. So the trial judge on remand may conclude it is sufficient to support the jury's consideration of punitive damages.

**DICKINSON, P.J., JOINS THIS OPINION. RANDOLPH, P.J., JOINS THIS OPINION IN PART.**

**KING, JUSTICE, DISSENTING:**

¶36. Because the majority misinterprets the antitrust statutes, I disagree with the majority's determination that Cook Timber failed to present sufficient evidence to support an antitrust violation, and I therefore respectfully dissent.

---

[23] Dickinson, P.J., not participating.

15

¶37. Georgia Pacific (GP) contends that the verdict in favor of Cook Timber Company (CTC) was not supported by the evidence because Dr. William Shughart failed to establish that GP was a monopolist, and CTC did not present evidence showing that GP was engaged in a conspiracy, even after Dr. Shughart testified that GP must have conspired with another party to have successively driven down prices. We find that there was sufficient evidence for the jury to find that GP violated Mississippi Code Section 75-21-3. *See* Miss. Code Ann. § 75-21-3 (Rev. 2009).

¶38. Mississippi Code Section 75-21-3 states:

> Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree inimical to public welfare, and shall thus:
> (a) Restrain or attempt to restrain the freedom of trade or production;
> . . .
> (c) Or shall engross forestall or attempt to engross or forestall any commodity
> . . . .

Miss. Code Ann. § 75-21-3 (Rev. 2009).

¶39. To analyze a restraint-of-trade claim, this Court applies the rule of reason. In ***Brown v. Staple Cotton Co-op Association***, 132 Miss. 849, 855 (1923), this Court found that a restraint on a business's trade will not be void unless the restraint was unreasonable or there was an undue restraint of trade. "It must be such a restraint of trade as is detrimental to the public interest." ***Id***. at 855.

¶40. This Court reviews a trial court's denial of a judgment notwithstanding the verdict (JNOV) *de novo*. ***Mine Safety Appliance Co. v. Holmes***, 171 So. 3d 442, 446 (Miss. 2015). We view the evidence in the light most favorable to the nonmoving party. ***Union Carbide***

*Corp. v. Nix, Jr.*, 142 So. 3d 374, 384 (Miss. 2014). "When determining whether the evidence was sufficient, the critical inquiry is whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions." ***Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara***, 908 So. 2d 716, 726 (Miss. 2005) (citing ***Jesco, Inc. v. Whitehead***, 451 So. 2d 706, 713–714 (Miss. 1984)) (emphasis in original). "Thus, this Court considers whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." ***Estate of Jones v. Phillips ex rel. Phillips***, 992 So. 2d 1131, 1146 (Miss. 2013) (citing ***Spotlite Skating Rink, Inc*. v. Barnes**, 988 So. 2d 364, 368 (Miss. 2008)).

¶41.    The majority finds that CTC's claims do not fit within Section 75-21-3. In finding so, the majority completely ignores the plain language of the statute and cites with authority caselaw interpreting an entirely different provision.  Beginning with the language of subsection (c), this subsection prohibits engrossing, forestalling, or attempting to engross or forestall any commodity.  The majority states that "this Court held that [an older version of the statute] prevented businesses from fixing prices for commodities outside the law of supply and demand.  For instance, that prohibition precluded an agreement between oyster sellers always to sell oysters at a fixed price.  While the current version of the statute does not contain the phrase price fixing, engross, in the antitrust sense, means "to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price. But this case involves Georgia Pacific's actions as a consumer, not a seller."  Maj. Op. ¶ 15.

17

The majority erroneously cites *Barataria Canning Co. v. Joulian* for this proposition. *Barataria Canning Co. v. Joulian*, 80 Miss. 555, 31 So. 961 (1902). The Court in *Barataria* examined the prohibitions against limiting, increasing, or reducing the price of a commodity, *not* the prohibition against forestalling or engrossing. Further, the majority's emphasis on GP being a consumer, and not a seller, is curious, because both engrossing and forestalling refer to buying behavior. To engross historically meant "[t]o *buy* large quantities of (a stock or commodity) in an effort to corner the market and control the price." *Engross*, Black's Law Dictionary (10th ed. 2014) (emphasis added); *Village Food & Liquor Mart v. H&S Petroleum, Inc.*, 647 N.W.2d 177, 184, 184 n.10 (Wis. 2002) (quoting 4 William Blackstone, *Commentaries on the Laws of England*, ch. 12, at 159 (1778) as defining engrossing as "*buying* up large quantities of corn or other dead victuals, with the intent to sell them again. This must of course be injurious to the public, by putting it in the power of one or two rich men to raise the price of provisions at their own discretion." (emphasis added)). To "forestall" historically meant "[t]o *buy* (goods) for the purpose of reselling at a higher price. At common law, this was an indictable offense." *Forestall*, Black's Law Dictionary (10th ed. 2014) (emphasis added); *Village Food & Liquor Mart*, 647 N.W.2d at 184 n.8 (quoting 4 William Blackstone, *Commentaries on the Laws of England*, ch. 12, at 158-59 (1778), defining "forestalling the market" as "*buying* or *contracting* for any merchandise or victual coming in the way to market, or dissuading persons from bringing their goods to market; or dissuading persons from bringing their goods or provisions there; or persuading them to enhance the price, when there: any of which practices make the market dearer to the fair

trader." (emphases added)). Clearly, subsection (c) contemplates – indeed it entirely encompasses – buying behavior in its prohibition. The majority emphasizes that Georgia Pacific cannot be engrossing because it is not attempting to corner the market when it is not a seller in that market.[24] While it is true that engrossing and forestalling often traditionally involved reselling goods at a higher price, the point the majority misses is that the antitrust statutes have for hundreds of years applied to purchasing behavior that harmed the natural course of trade and was inimical to the public welfare.

¶42.    As for subsection (a), the majority finds that "[n]o authority supports the view that, before this statute's adoption, businesses were prohibited from seeking to purchase material for the lowest possible cost." Maj. Op. ¶ 14. As described above, businesses have long been prohibited from certain purchasing behavior, including certain behavior to purchase at low prices. Moreover, when a business engages in purchasing behavior in an intentional attempt to manipulate the market, it is potentially a restraint of trade and thus a violation of the antitrust statute. Certainly, the example given by the majority of a consumer "stockpiling" a resource when the market for that resource is *naturally* low in an effort to lower long-term

<hr />

[24]Cook Timber filed a motion for rehearing in this case. The Attorney General filed an amicus brief on behalf of the State of Mississippi because it was so concerned about the majority's incorrect interpretation of the statute, which originally appeared to hold that no buying or purchasing behavior could come under the purview of the antitrust statutes. The attorney general argued that "the Court's description of [Section 75-21-3(c)] could impair the State and private plaintiffs' ability to halt all anticompetitive conduct which constitutes engrossing or forestalling a commodity. For instance, prohibited conduct includes preventing the normal course of trade by buying up vast amounts or otherwise diverting a commodity." Georgia Pacific's actions and attempted actions may be said to have been anticompetitive conduct which prevented the normal course of trade, particularly since the evidence indicates that Georgia Pacific was intentionally manipulating the normal course of trade.

costs would not likely run afoul of the antitrust statutes. However, the evidence in this case supports the conclusion that GP, a major consumer of the commodity at issue, was not simply taking advantage of a naturally low market, but was attempting to manipulate and control what would have otherwise been natural market prices for the commodity it needed. When evidence of attempts to manipulate and control the market exist, such behavior may fall within the ambit of a restraint of trade under the antitrust statutes, whether such behavior was committed by a reseller or a "mere" consumer. Thus, I disagree with the majority's misinterpretation of the antitrust statute, and believe that we must examine the evidence before us.

¶43. CTC argues that GP possessed buyer power and used this buyer power to restrain trade through several outlets: (a) its Project Hawker program; (b) the use of core/preferred suppliers; (c) its exploitation of inventories at its mills; (d) the circulation of price lists to competitors; and (e) its docking and culling procedures and policies.

### A. Project Hawker

¶44. CTC claimed that GP implemented a program called Project Hawker to drastically reduce wood prices. While the record is not clear as to what exactly Project Hawker is, several GP internal documents made reference to the program.

¶45. A memo with the subject "Operation Hawker" stated "I am getting reports that some of the competition is pulling their price down about as fast as we are. I am of the opinion that we are the ones making the difference and everyone else is following. We only have one objective, deliver the cheapest log possible to the plants."

20

¶46.    Another intracompany memo entitled "Project Hawker (Wood Cost Reduction)" read "[w]ood cost came down 7% on the average which translates into a savings to G-P of approximately $45 million over a quarter or $175 million on an annualized basis."

¶47.    Noel Tulmison, a current GP employee, testified that he did not know what Project Hawker was but only that GP wanted to reduce its prices.  Roy West, a former GP manager, testified that the program was an initiative to reduce prices. According to West, wood products had been at a historic high and GP wanted to reduce its costs due to predictions that the demand for GP products would not be high for the next few years.

¶48.    Dr. Shughart testified that Project Hawker was a means for GP to reduce its prices by seven percent but that GP far exceeded a seven percent decrease in prices. Dr. Shughart found that, before GP implemented Project Hawker, in March 1998 and several weeks before,  CTC received $33.50 per ton for pine pulpwood. When the program was implemented, the price was reduced to $28 per ton until the end of May, when the price remained in the low-to-mid twenties. CTC continued to receive about $20 per ton until GP informed CTC that it would discontinue purchasing pine pulp from CTC.

### B.    Core Supplier Program

¶49.    GP instituted a core supplier program whereby it reduced the  number of suppliers from which it bought wood. CTC was not chosen as one of the core suppliers and argues that GP's ability to terminate its relationship with so many suppliers demonstrates the market power GP possessed and its ability to manipulate the market. An example of the emails regarding the core supplier program stated:

21

I want you folks to pick the suppliers you want to do business with and give them a GOOD quota, one they can make a living with. If they are not consistent suppliers, get rid of them. They will help drive the price down. The discipline is going to come when they offer you the wood cheaper than you have agreed to pay your steady suppliers. MAKE THEM EAT IT.

¶50.    A separate email stated:

Choose suppliers you can trust and give them quota, with the expectation of receiving wood from them when we need it, at our price.

¶51.    However, according to West, the core supplier program was a concept that GP instituted to have as few suppliers produce as much wood as GP needed to operate its facilities. West claimed that at one point, GP had close to 200 suppliers, but approximately forty suppliers now produced eighty percent of GP's wood.

### C.    Exploitation of Inventory

¶52.    CTC claims that GP increased its inventory by filling its mills to the maximum so that when suppliers hauled their wood to the mill, they were forced either to receive a lower price for their wood or to have their delivery rejected. Examples of several GP emails regarding inventory read:

Inventory remains our major barometer. We are willing to push prices because we have the inventory to do so and that is what we said we would do. It is not our plan to get below our strategic inventory level.

[O]ur procurement strategy is founded on maintaining target inventories. Stick to them unless you have a plan to pull down prices at a location. We use these inventories to "walk away from deals."

Without inventories, we have little leverage that will let us "walk away from deals."

Most of our inventories are at or above target which should give us added confidence that we can bring prices down without unnecessary downtime. I

want to re-iterate, we are willing to take any solid wood facility down if we can't make money or feel we can greatly lower future wood cost as a result of the closure.

### D. Distribution of Blue Sheets

¶53. GP created blue sheets, or price lists, identifying the maximum price each mill would pay for each type of fiber. The blue sheets were posted on the internet, sent to GP's suppliers, and sent to several wood processing companies that supplied wood to GP. CTC asserts that GP violated its own antitrust compliance policy by distributing the blue sheets, with every price for each type of fiber, to its competitors. GP's Antitrust Compliance Policy states:

> No employee may: (a) send any price list to, or receive any price list from, a competitor (other than a price list received from a regular supplier or sent to a regular customer regarding the products supplied or sold).

¶54. This provision explicitly prohibits GP from sending its blue sheets to its competitors; however, this provision allows GP to send blue sheets to its regular customers. Ricky Kelly, a former GP manager, testified that the blue sheets were sent to competitors that regularly sold wood to GP. CTC argues that the distribution was a violation because all of GP's competitors would know the prices GP paid for all of its wood products, including the wood products the competitors did not supply to GP. As a result, other wood companies could decrease their wood prices to compete with GP.

### E. Docking and Culling Procedures

¶55. In the purchase plant agreement, GP had the right to "dock" or deduct from CTC's final payment the prices of any wood that was rotten or had a defect. When the wood was hauled to GP mills, GP measured the wood and made any deductions. There was conflicting

23

testimony regarding whether actual measurements or estimations were made as to the damage on each log. Dennis Hough, a former procurement manager of GP, testified that GP employees never measured the actual defect but only estimated how vast the deduction was. Kelly, however, testified that each log was measured.

¶56. After the wood was measured, GP made deductions based on the location and extent of the defect. In the purchase plant agreement, GP was allowed to retain the wood that did not meet its specifications. CTC claims that this practice allowed GP to lower wood prices because first, GP could deduct payments without allowing truckers to ensure that the wood did not meet GP specifications and second, CTC was not paid for the defective wood although GP processed the wood and used it as "chip n saw."

¶57. Viewing the evidence in the light most favorable to the verdict, it is clear that CTC presented sufficient evidence to sustain an antitrust claim under the Mississippi Antitrust Act. Reasonable and fair-minded jurors could have come to different conclusions regarding whether GP engrossed, forestalled, or attempted to engross or forestall a commodity, and whether GP restrained or attempted to restrain the freedom of trade or production.

¶58. I also believe that this Court should affirm the trial court regarding the issues of expert testimony, the jury instructions, and punitive damages. Because of the lack of guidance on the punitive damages issue, I will address my views on how we should resolve the issue.

¶59. Mississippi Code Section 75-21-39, regarding the applicability of the chapter, explicitly provides that "[t]his chapter shall be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business

24

preserved to the people of this state." Miss. Code Ann. § 75-21-39 (Rev. 2009). Thus, the Legislature has specifically mandated that we liberally construe Section 75-21-9 when interpreting it.

¶60. In 1906, the Legislature added a fine for the violation of the antitrust statutes. Miss. Code Ch. 145, § 5007 (1906). The statute stated that "[a]ny person injured or damaged by a trust and combine as herein defined, or its effects direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars, and all actual damages[.]" *Id.* The chapter also included an entirely separate penalty per violation that an entity violating the chapter must pay, recoverable by the State, rather than what an individual injured may recover. Miss. Code Ch. 145, § 5004 (1906) (Any one "violating any of the provisions of this chapter, shall forfeit not less than two hundred dollars nor more than five thousand dollars for every such offense, and each day such person, corporation, partnership, or association shall continue to do so shall be a separate offense[.]"). In 1926, the Legislature changed this language to state: "Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it whether or not inimical to public welfare and in addition a penalty of five hundred dollars ($500.00)[.]" Miss. Gen. Laws Ch. 182, § 4 (1926). In 1930, the language "whether or not inimical to public welfare" was removed. Miss. Code Ch. 68 § 3440 (1930). The relevant language and penalty have remained unchanged since 1926. Miss. Code Ann. § 75-21-9 (Rev. 2009) ("Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its

25

effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00)[.]").

¶61.    Thus, the major alteration in this statute was changing that a person may recover "all actual damages" to that a person may recover "all damages of every kind sustained by him." In both versions of the statute, the person may also recover a penalty of $500.  The change from "all actual damages" to "all damages of every kind sustained" appears to be more of a substantive change than a structural one.  Removing the specific type of damages (actual) and changing it to "all damages" broadens the types of damages that an injured party may recover.  This is especially true when the statute is properly liberally construed to the end of suppressing trusts.  *See* Miss. Code Ann. § 75-21-39 (Rev. 2009).  If the Legislature had meant to keep the damages recoverable the same, i.e., limited to actual damages, it had already specifically and clearly done so, and no plausible explanation exists for the Legislature to change the language so drastically to language that *less* clearly limits the damages to actual damages.  Furthermore, the injured party arguably did "sustain" punitive damages to some extent.  Punitive damages are for the purpose of punishing the wrongdoer and deterring future similar conduct by others, thereby protecting the public.[25] ***Standard Life Ins. Co. of Indiana v. Veal***, 354 So. 2d 239, 247 (Miss. 1977) (quoting ***Snowden v. Osborne***, 269 So. 2d 858 (Miss. 1972), *overruled on other grounds by **C&C Trucking Co. v. Smith***, 612 So. 2d 1092 (Miss. 1992)).  The injured party is ostensibly a member of the public, and

---

[25]Punitive damages also benefit the plaintiff in that, in the absence of statutory authority granting attorneys' fees, attorneys' fees are only proper when punitive damages are also proper.  ***Mississippi Power & Light Co. v. Cook***, 832 So. 2d 474, 486 (Miss. 2002).  Thus, a punitive damages award essentially creates a right to recover attorneys' fees.

26

thus sustained damages by the wrongdoer's actions. Additionally, punitive damages, in part, "constitute[] compensation for the plaintiff for his or her 'public service' in bringing the action." *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1190 (Miss. 1990); *see also United American Ins. Co. v. Merrill*, 978 So. 2d 613, 636 (Miss. 2007) (unanimously reaffirming *Williams*, 566 So. 2d 1172).

¶62. Moreover, Section 75-21-39 also contains a savings clause, mandating that "[n]o right, liability, pain, penalty, forfeiture, prosecution or suit under laws existing prior to the adoption of this chapter shall be in any wise affected thereby[.]" Miss. Code Ann. § 75-21-39 (Rev. 2009). Punitive damages existed in Mississippi common law in the 1800s. *See Bell v. Morrison*, 27 Miss. 68 (1854). Thus, the antitrust laws did not affect the liability for punitive damages, nor eliminate them as a penalty or as the subject of a suit.

¶63. It can hardly be said in this case that the slightly more than $11,000 in actual damages and a $500 penalty would be anything more than a very light slap on the wrist to a corporation as large as GP. These amounts can hardly be argued to do anything toward suppressing trusts and combines and encouraging competition.[26] Thus, when we liberally construe the statutes "to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state[,]" we must conclude that the Legislature meant to expand the damages allowable when it changed the language of the statute from "actual damages" to more expansive phrasing, and we must

---

[26]Five hundred dollars in 1906, when considering the value of a dollar and the smaller nature of corporations, would have been a much better deterrent than five hundred dollars is in 2015.

27

conclude that nothing in the antitrust statutes affects the right to pursue, or the liability for, punitive damages. Such damages provide a deterrent to trusts and combines and encourage competition in business for the benefit of the public, promoting the Legislature's stated purpose of the antitrust statutes.

¶64. Because I conclude that punitive damages are allowed under the antitrust statutes, I will conduct a brief analysis of the other issues regarding punitive damages that GP raises on appeal.

¶65. GP argues that no reasonable juror could have concluded that punitive damages were warranted under Mississippi Code Section 11-1-65, and it had consequently moved for a directed verdict on this issue at trial. The standard of review for a denial of a motion for directed verdict, considering the evidence in the light most favorable to the appellee and giving the appellee the benefit of all favorable inferences that may reasonably be drawn from that evidence, is whether "the facts are so overwhelmingly in favor of the appellant that reasonable jurors could not have arrived at a contrary verdict." *Mississippi Power & Light Co. v. Cook*, 832 So. 2d 474, 478 (Miss. 2002). Conversely, if substantial evidence, or "evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions," in support of the verdict exists, this Court must affirm. *Id.*

¶66. Punitive damages may be awarded if the claimant proves by clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."

Miss. Code Ann. § 11-1-65 (Rev. 2014). The most relevant portion of the statute to this case is whether GP acted with "actual malice." The section of this opinion regarding sufficiency of the evidence details many of the emails and pricing schemes of GP. This evidence is clearly of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions as to whether actual malice existed. Thus, the trial court did not err by denying GP's motion for directed verdict as to punitive damages.

¶67.    GP also argues in the alternative that if this Court does not reverse the punitive damages award, it should remit it. In reviewing the denial of a motion for a remittitur or a motion for a new trial on the issue of punitive damages, this Court will only reverse where the trial court committed an abuse of discretion. ***Bankers Life and Cas. Co. v. Crenshaw***, 483 So. 2d 254, 279 (Miss. 1985).

¶68.    GP asserts that the punitive damages award should be remitted under Mississippi law. Mississippi Code Section 11-1-65 requires the trial court to take the following factors into consideration in determining whether a punitive damages award is excessive:

> 1. Whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred;
>
> 2. The degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct;
>
> 3. The financial condition and net worth of the defendant; and

4. In mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct.

Miss. Code Ann. § 11-1-65(1)(f)(ii) (Rev. 2014). The statute also notes that "the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others[.]" Miss. Code Ann. § 11-1-65(1)(e) (Rev. 2014); *see also Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172 (Miss. 1990) (punitive damages are for the purposes of punishment and deterrence). Punitive damages should be in an amount reasonably necessary to punish the wrongdoer, taking into consideration the harmful effect on the individual litigant and the public. *See Employers Mut. Cas. Co. v. Tompkins*, 490 So. 2d 897 (Miss. 1986). In determining the amount of punitive damages, four factors are considered: whether the amount punishes and deters the wrongdoer, whether the amount deters others, whether the amount accounts for the defendant's financial worth, and whether the amount compensates the plaintiff for the public service in holding the defendant accountable.[27] *Merrill*, 978 So. 2d at 636. GP opines that only the first and second statutory factors are relevant, because neither CTC nor GP offered any evidence as to the third and fourth factors. However, some financial information about GP was in the record. Moreover, in the hearing on the remittitur, the trial court noted that "to somebody like IBM or Georgia Pacific, $2.5 million based on their net worth is nothing. I mean, Mr. Cook was paid somewhere around 2.5 million over four years for the wood he sold." The trial court also

---

[27]As noted, punitive damages pave the way for a plaintiff to receive attorneys' fees. Punitive damages are also meant to compensate the plaintiff for his public service in bringing the suit. Thus, attorneys' fees may arguably be included in "all damages sustained" by the plaintiff under Section 75-21-9.

noted that the jury considered emails emanating from GP headquarters that could come across as "just being plain mean."

¶69. GP's argument in this regard primarily concentrates on the ratio of actual to punitive damages. It first notes that there is no reasonable relationship between the punitive damages award and the harm suffered, because the harm suffered was quantified as $11,089.47. It notes that the ratio between punitive and actual damages is large, more than 225:1. However, what GP fails to acknowledge is that the harm suffered in an antitrust case is largely harm to the public and to competition, not solely harm that resulted to the single plaintiff in this case. Moreover, the first statutory factor also considers the harm "likely to result" from GP's behavior, which the plaintiff showed was suppression of competition in the marketplace. This Court has approved punitive damages awards in ratios greater than the one in this case. *See, e.g.*, **Tompkins**, 490 So. 2d 897 (approving punitive damages in an amount 800 times greater than actual damages); ***Independent Life & Accident Ins. Co. v. Peavy***, 528 So. 2d 1112 (Miss. 1988); ***State Farm Mut. Auto. Ins. Co. v. Grimes***, 722 So. 2d 637 (Miss. 1998) (approving a punitive damages award with a ratio of punitive to compensatory damages of 658 to 1); *see also* ***TXO Prod. Corp. v. Alliance Res. Corp.***, 509 U.S. 443, 113 S. Ct. 2711, 125 L. Ed. 2d 366 (1993) (affirming punitive damages in an amount 526 times greater than compensatory damages).

¶70. The second factor looks at the reprehensibility of GP's conduct, as well as the duration, GP's awareness, any concealment, and the existence of similar past conduct. GP argues that its conduct was not reprehensible. Yet, as the trial court noted, some GP emails

31

regarding the pricing schemes were "just being plain mean."[28]  Moreover, GP's pricing schemes lasted for several years, thus the duration of the conduct was certainly significant. GP was also clearly aware of its pricing schemes, and the trial court noted that it at times invoked a "mean" spirit in applying them.

¶71.    As relates to both of these factors, as well as the third factor, the record contains certain financial information regarding the schemes.  For example, an email out of GP headquarters in Atlanta stated that "For every 1% that you can reduce overall wood cost, you will add $25 million to our operating profit.  Thus, if we hit our goal of a 10% reduction across all products in the 3rd quarter, we will add $250 million to the bottom line."  A 1999 note from GP stated that "We finished the first half of 1999 with a great performance record for Wood and Fiber Procurement. . . . We have worked safely while lowering wood costs $120 million below last year at this time[.]"  In another 1999 note from GP, industry news was quoted stating that GP's "net income increased 114 percent to $311 million versus net income of $33 million in 1998."  A 2001 memo from GP stated that "Wood cost came down 7% on the average which translates into a savings to G-P of approximately $45 million over a quarter or $175 million on an annualized basis."  Yet another email noted that "You should all be proud of the accomplishments you have acheived [sic] thus far.  Millions of dollars have been placed back in G-P's pockets, instead of outsiders."  A November 1999 email noted that GP had "saved $142 million in wood cost Vs 1998.  We will give up some of this

---

[28]For example, one email stated: "No one thinks it is your fault that the Indians have surrounded the wagon train, but don't feel bad for killing as many of them as you can before they kill us.  Buy timber as cheap as you can."

in the fourth quarter but will still be above $130 million in savings. This will be approximately 10% of G-Ps profits for the year!" The record also contains other financial information about GP, as well as other information relating to the profits and savings from the schemes at issue.

¶72.    Certainly, the information about the profits earned from the schemes relates to the relationship between the punitive damages award and the harm done or likely to occur, as well as the reprehensibility of the conduct. It further touches on the financial condition of GP, and is also important to determine the amount of punitive damages necessary to have a deterrent effect. The record makes clear that the profits from the schemes at issue were in the hundreds of millions of dollars over several years. It appears obvious that $2.5 million in punitive damages would be a very small percentage of GP's net worth. *See Merrill*, 978 So. 2d at 636 (noting that the punitive damages award was acceptable, in part because it was less than one-half of one percent of the defendant's net worth). Given all this information, the trial court clearly did not abuse its discretion by declining to remit the punitive damages award as determined by the jury.[29] It is difficult to imagine that a lesser award would "punish and deter" a corporation as large as GP.

---

[29]GP also argues that the award violates due process under *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). That case states that the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility. *Id.* at 575. It also requires a look at the ratio of punitive damages to the actual harm inflicted, as well as sanctions for comparable misconduct. *Id.* at 580-84. Based on the same facts mentioned in the analysis under Mississippi law, I am of the opinion that the punitive damages award was constitutionally acceptable.

¶73. Because I believe this Court should determine that Section 75-21-9 allows punitive damages in antitrust cases, I would affirm the trial court on this issue. I further believe that the punitive damages award at issue should be affirmed.

**RANDOLPH, P.J., AND KITCHENS, J., JOIN THIS OPINION**.